Ekwan E. Rhow - State Bar No. 174604
 erhow@birdmarella.com
Grace W. Kang - State Bar No. 271260
 gkang@birdmarella.com
A. Howard Matz - State Bar No. 55892
 hmatz@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM,
DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Nicholas Groombridge (*pro hac vice*)
 ngroombridge@paulweiss.com
Jenny C. Wu (*pro hac vice*)
 jcwu@paulweiss.com
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

David J. Ball, Jr. (*pro hac vice*)
 dball@paulweiss.com
J. Steven Baughman (*pro hac vice*)
 sbaughman@paulweiss.com
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420

Attorneys for Defendant Twitter, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation,<br><br>      Plaintiff,<br><br>  vs.<br><br>TWITTER, INC., a Delaware corporation,<br><br>      Defendant. | CASE NO. 2:19-cv-01444-GW (KSx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TWITTER, INC.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Date:    August 29, 2019<br>Time:   8:30 a.m.<br>Crtrm.:  9D<br><br>Assigned to Hon. George H. Wu |

# **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ..........................................................................................................1

LEGAL STANDARD ....................................................................................................1

ARGUMENT ................................................................................................................3

I. The '089 Patent...........................................................................................3

    A. The '089 Patent Claims Are Directed to the Abstract Idea of Flagging New Messages Until an Inbox Has Been Checked ................................................5

    B. The '089 Patent Claims Add No Inventive Concept ....................................6

II. The '182 Patent...........................................................................................7

    A. The '182 Patent Claims Are Directed to the Abstract Idea of Inferring the Status of Messages in a Conversation ........................................................8

    B. The '182 Patent Claims Add No Inventive Concept ....................................9

III. The '059 Patent.........................................................................................10

    A. The '059 Patent Claims Are Directed to the Abstract Idea of Communicating the Availability of Content Through a Networked Hub ....11

    B. The '059 Patent Claims Add No Inventive Concept ..................................13

IV. The '777 Patent.........................................................................................14

    A. The '777 Patent Claims Are Directed to the Abstract Idea of Screening Repetitive Content When It Becomes Excessive ........................................15

    B. The '777 Patent Claims Add No Inventive Concept ..................................17

V. The '351 and '929 Patents (the "Advertising Patents") ............................18

    A. The Advertising Patent Claims Are Directed to the Abstract Idea of Assembling Targeted Advertising ..............................................................20

    B. The Advertising Patent Claims Add No Inventive Concept .......................22

VI. The '120 Patent.........................................................................................24

    A. The '120 Patent Claims Are Directed to the Abstract Idea of Sorting, Analyzing, and Presenting New Messages..................................................27

    B. The '120 Patent Claims Add No Inventive Concept ..................................28

1

CONCLUSION..........................................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accenture Glob. Servs., GmbH* v. *Guidewire Software, Inc.*,
    728 F.3d 1336, 1344 (Fed. Cir. 2013) ................................................................. 18

*Alice Corp. Pty. Ltd.* v. *CLS Bank Int'l*,
    573 U.S. 208 (2014) ...................................................................................... passim

*Berkheimer* v. *HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ............................................................................ 3

*Blackberry Ltd.* v. *Facebook, Inc.*,
    No. 18-cv-01844-GW(KSx), 2018 WL 4847053 (C.D. Cal. Aug. 21,
    2018) ......................................................................................................... passim

*BlackBerry Ltd. v. Facebook, Inc.*,
    No. 2:18-cv-01844-GW-KS (C.D. Cal. Apr. 5, 2019), ECF No. 157 ................. 23

*BSG Tech LLC* v. *Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) .......................................................... 2, 3, 23, 24

*buySAFE, Inc.* v. *Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) .......................................................................... 13

*ChargePoint, Inc.* v. *SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) ............................................... 2, 12, 17, 18, 20, 24

*Content Extraction & Transmission LLC* v. *Wells Fargo Bank*,
    776 F.3d 1343 (Fed. Cir. 2014) ............................................................................ 7

*Credit Acceptance Corp.* v. *Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017) .................................................................... 11, 13

*CyberSource Corp.* v. *Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ............................................................................ 2

*Diamond* v. *Diehr*,
    450 U.S. 175, 185 (1981) ..................................................................................... 2

*Elec. Power Grp., LLC* v. *Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) .................................................................... passim

MEMORANDUM IN SUPPORT OF DEFENDANT TWITTER, INC.'S MOTION TO DISMISS

*Essociate, Inc.* v. *Clickbooth.com, LLC*,
   No. 13-cv-01886-JVS(DFMx), 2015 WL 1428919 (C.D. Cal. Feb.
   11, 2015) ..................................................................................................24

*FairWarning IP, LLC* v. *Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016) ..........................................................6, 12, 18

*Intellectual Ventures I LLC* v. *Erie Indem. Co.*,
   850 F.3d 1315 (Fed. Cir. 2017) ...................................................................29

*Intellectual Ventures I LLC* v. *Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) .................................................3, 6, 27, 28, 29

*Intellectual Ventures* v. *Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ...............................................................2, 21

*Interval Licensing LLC* v. *AOL, Inc.*,
   896 F.3d 1335, 1344 (Fed. Cir. 2018) ....................................................16, 17

*OpenTV, Inc.* v. *Apple, Inc.*,
   14-cv-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015).......................14

*OpenTV, Inc.* v. *Netflix Inc.*,
   76 F. Supp. 3d 886 (N.D. Cal. 2014)............................................................21

*Prod. Ass'n Techs. LLC* v. *Clique Media Grp.*,
   No. CV 17-05463-GW(PJWx), 2017 WL 5664986 (C.D. Cal. Oct.
   12, 2017), *aff'd* 738 F. App'x 1021 (Fed. Cir. 2018)..........................................1

*Return Mail, Inc.* v. *USPS*,
   868 F.3d 1350 (Fed. Cir. 2017) ...................................................................29

*SAP Am., Inc.* v. *Investpic LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ...........................................................passim

*Smart Sys. Innovations, LLC* v. *Chicago Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017) ...................................................................24

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ............................................................17, 18, 20

*Trading Techs. Int'l, Inc. v. IBG LLC*,
   921 F.3d 1084 (Fed. Cir. 2019) .......................................................1, 22, 27, 29

MEMORANDUM IN SUPPORT OF DEFENDANT TWITTER, INC.'S MOTION TO DISMISS

*Two-Way Media Ltd.* v. *Comcast Cable Commc'ns*,
  874 F.3d 1329 (Fed. Cir. 2017) ....................................................................passim

# INTRODUCTION

Each of BlackBerry's seven asserted patents is patent-ineligible under 35 U.S.C. § 101.  Four of these patents, which the Court has not previously considered, are all directed to age-old, fundamental concepts of communication.  U.S. Patent No. 8,286,089 (the "'089 Patent") is directed to flagging new messages until the inbox has been checked.  U.S. Patent No. 8,572,182 (the "'182 Patent") is directed to inferring the status of messages in a conversation.  U.S. Patent No. 9,021,059 (the "'059 Patent") is directed to communicating the availability of information through a networked hub.  U.S. Patent No. 8,825,777 (the "'777 Patent") is directed to screening repetitive content when it becomes excessive.  Although this Court previously declined, without prejudice, to dismiss claims based on the other three patents, those are also all directed to mere abstract ideas, as the intrinsic evidence and additional Federal Circuit guidance establish.  For example, just a few months ago, the Federal Circuit made clear that claims directed to displaying information, even as a new arrangement, are patent-ineligible when they merely improve how a user processes information.  Such claims "do not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem."  *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019).  U.S. Patent No. 8,296,351 (the "'351 Patent") and U.S. Patent No. 8,676,929 (the "'929 Patent") are directed to the fundamental practice of assembling targeted advertising.  U.S. Patent No. 9,349,120 (the "'120 Patent) is directed to sorting, analyzing, and presenting new messages.  Twitter respectfully submits that this Court should review these patents again in light of *Trading Technologies* and other precedent.  All asserted patents are directed towards general communications concepts, and the First Amended Complaint should be dismissed.

# LEGAL STANDARD

Dismissal of a patent complaint at the pleadings stage is appropriate where all of the asserted patent claims are patent-ineligible under 35 U.S.C. § 101.  *See, e.g.*,

*Prod. Ass'n Techs. LLC* v. *Clique Media Grp.*, No. CV 17-05463-GW(PJWx), 2017 WL 5664986, at \*9–\*10 (C.D. Cal. Oct. 12, 2017) (dismissing complaint where the only specifically identified patent claim in the complaint was found patent-ineligible), *aff'd* 738 F. App'x 1021 (Fed. Cir. 2018).  A patent is invalid if it claims patent-ineligible subject matter, such as laws of nature, natural phenomena, or abstract ideas. *Diamond* v. *Diehr*, 450 U.S. 175, 185 (1981).  In the computer context, subject-matter eligibility is evaluated under the two-step framework set forth in *Alice Corp. Pty. Ltd.* v. *CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014).

**Step one** of *Alice* analyzes whether the "'focus' of the claims, their 'character as a whole,'" is directed to an abstract idea.  *Elec. Power Grp., LLC* v. *Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (internal citations omitted).  And, as the Federal Circuit recently clarified, the "directed to" inquiry may also involve looking to the specification to understand "the problem facing the inventor" and, ultimately, what the patent describes as the invention.  *ChargePoint, Inc.* v. *SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019).  For example, it is indicative that a claim is directed to an abstract idea when the specification does not suggest an "improve[ment] from a technical perspective," or that the claimed invention results in something "operat[ing] differently than it otherwise could," or "that the invention involved overcoming some sort of technical difficulty."  *Id.* at 768.

Courts have recognized various forms of abstract ideas, including:  (1) activity that can be performed mentally or with pen and paper; (2) methods of organizing human activity, including the use of rules to take certain actions; (3) long-prevalent or fundamental practices; and (4) methods for organizing data, such as collecting, analyzing, and displaying data. *See, e.g.*, *Alice*, 573 U.S. at 219; *Intellectual Ventures* v. *Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015); *CyberSource Corp.* v. *Retail Decisions, Inc.*, 654 F.3d 1366, 1371–72 (Fed. Cir. 2011).  A patent directed to an abstract idea does not become patentable simply by claiming the abstract idea within a narrow technological context or use case.  *BSG Tech LLC* v.

1   *Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018).

2       ***Step two*** of the analysis looks more precisely at whether the claim elements,

3   individually or in their ordered combination, add an "inventive concept," *i.e.*, whether

4   additional elements "'transform the nature of the claim' into a patent-eligible

5   application" or "amount[] to significantly more" than a patent on the abstract idea

6   itself. *Alice*, 573 U.S. at 217–18.  A claim fails step two if the additional elements are

7   well-understood, routine, and conventional, requiring no more than "a generic

8   computer to perform generic computer functions."  *Intellectual Ventures I LLC* v.

9   *Symantec Corp.*, 838 F.3d 1307, 1313, 1315 (Fed. Cir. 2016).  It also fails if the

10  elements are themselves directed to an abstract idea, including those that "simply

11  restate[] what . . . [is] already determined [to be] an abstract idea." *BSG*, 899 F.3d at

12  1291; *see also SAP Am., Inc.* v. *Investpic LLC*, 898 F.3d 1161, 1169 (Fed. Cir. 2018)

13  (claim details that "are themselves abstract" are not inventive concepts).  Accordingly,

14  the inventive concept often rests on a showing that the limitations "improve the

15  functioning of the computer itself," *i.e.*, that they solve a technological problem. *See*

16  *Symantec*, 838 F.3d at 1315, 1318 (quoting *Alice*, 573 U.S. at 225).

17      Importantly, the § 101 inquiry must remain focused on the claims.  No

18  deference is owed to a complaint's unsupported recitations that a claimed element is

19  non-routine.  *Blackberry Ltd.* v. *Facebook, Inc.*, No. 18-cv-01844-GW(KSx), 2018

20  WL 4847053, at *8–*10 (C.D. Cal. Aug. 21, 2018) [hereinafter "*Facebook/Snap*"]

21  (invalidating BlackBerry's patent despite complaint's allegations that the claims were

22  non-routine and unconventional).   Additionally, improvements disclosed in the

23  specification can confer patent eligibility only "to the extent they are captured in the

24  claims." *Berkheimer* v. *HP Inc.*, 881 F.3d 1360, 1369–70 (Fed. Cir. 2018).

25                          <u>**ARGUMENT**</u>

26  **I.   The '089 Patent**

27      The '089 Patent describes a method for setting and unsetting new message

28  indicators—specifically,  displaying  an  indicator  on  a  home  screen  when  new

messages have been received, and turning off that indicator after the user has viewed the inbox (or what the claims call a "message inventory display screen").  Claim 1, the only asserted claim identified in BlackBerry's Complaint, is recited below with key portions bolded:

> 1.  A method of representing new electronic messages on a communication device having a display, the method comprising:
>
> **receiving a new electronic message**;
>
> setting a new message flag to indicate receipt of the new electronic message;
>
> **representing, on a home screen displayed on the display, a new message indicator** when the new message flag is set;
>
> receiving an invocation to **switch the home screen displayed on the display to a message inventory display screen** for viewing a listing including a plurality of electronic messages including the new electronic message, the message inventory display screen displaying a preview, for each listed electronic message, of either a subject line or of a portion of contents of the electronic message, the contents of an electronic message being accessible upon receipt of a request to open an electronic message from the list of messages;
>
> **unsetting the new message flag in response to the invocation to switch the home screen displayed on the display to the message inventory display screen**, the unsetting of the flag occurring **without having received a request to open the new electronic message**; and
>
> receiving an invocation to switch the message inventory display screen to the home screen, wherein **the new message indicator represented on the home screen is not displayed** as a result of the unsetting of the new message flag.

The patent explains that switching between a home screen and other types of display screens was well-known.  '089 Patent, 7:30–32 ("Display screens may be invoked for display from the home screen or from other application screens as is well known").  And that inboxes that preview messages in list form were well-known too. *Id.* at 1:39–41 ("Messages are typically presented in a message list showing limited information pertaining to each message . . . .").  Nor does the patent purport to have invented home screen indicators. *Id.* at 1:48–57.  Rather, the supposed invention is a

way for users "to be informed that they have new messages as distinct from unopened messages on the device"—that is, setting a new message indicator based on whether the user knows about, as opposed to opens, a new message. *Id.* By its own terms, it solves no technical problem.

## A. The '089 Patent Claims Are Directed to the Abstract Idea of Flagging New Messages Until an Inbox Has Been Checked

Claim 1 is directed to nothing more than the abstract idea of flagging new messages until an inbox has been checked. This is a mailbox management practice that does not arise from a technological problem or offer a technological improvement—it simply implements the familiar curbside mailbox flag in an electronic mailbox setting. The curbside mailbox has on its side a flag that indicates that new mail is present when the flag is raised. This corresponds to (and is quite literally) a "new message flag" that sets off a "new message indicator" as claimed by the patent. The mailbox flag is visible from the outside of the mailbox, much like the claimed "new message indicator" is visible on a home screen. After one checks the inside of the mailbox, the new mail can be previewed by scanning the envelopes, and the mailbox flag can be reset to an unraised position, even if one has not actually opened any mail. This is no different from what claim 1 teaches—"unsetting the new message flag" such that the new message indicator is no longer displayed after the user has switched from the home screen to the inbox without opening any of the new mail. Indeed, the patent itself explains that switching to the inbox is a "proxy for the user's awareness of the new messages," confirming that the patent does not claim a technological improvement. *Id.* at 7:41–43.

This same fundamental practice of mailbox management has been applied in other settings as well, such as digital answering machines that provide a new message indicator in the form of a blinking light or beeping sound until the user has checked the new messages. These machines turn off the new message indicator, even if all the user did was to retrieve information about the number of new messages, who sent the

messages, and the time the messages were sent, without actually listening to the messages.  So too here.

## B. The '089 Patent Claims Add No Inventive Concept

None of the elements of claim 1, whether individually or collectively, add an "inventive concept" that would transform the abstract idea here into a patent-eligible invention.  The claim recites the use of a "communication device having a display," which is wholly conventional and well-known, encompassing any device that can display messages on a screen, whether it be a desktop computer, mobile device, or digital answering machine.  The acts of receiving a new message, setting and unsetting indicators in response to certain events, switching between a home screen and a message display screen, and displaying a list of messages with their contents previewed, are all routine acts of such devices.  *See* '089 Patent at 1:34–51, 7:30–32; *Symantec*, 838 F.3d at 1316–20.

Nor is there anything unconventional about unsetting a new message flag in response to a user switching from a home screen to the inbox instead of in response to a user opening mail.  At most, the act of removing a new message indicator after a user has opened an inbox, even without opening individual mail, is just an application of a rule and does not transform the claim into something "significantly more."  But the Federal Circuit has held that implementing an abstract idea with a rule such as this remains an unpatentable abstract idea, particularly where the rule is not tied to a technological improvement.  *FairWarning*, 839 F.3d at 1094–95 (finding no inventive concept where claimed rules asked "the same questions (though perhaps phrased with different words) that humans in analogous situations . . . have asked for decades, if not centuries" and did not "improve[] existing technological process[es]"); *Facebook/Snap*, 2018 WL 4847053, at *8–*10 (finding abstract a claim that applied a specific rule to time stamping where "there is nothing that ties the rule to a technological improvement").  And there is certainly nothing unconventional about taking action on new mail without opening that mail.  As the Federal Circuit has

already confirmed, "it was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them." *Symantec*, 838 F.3d at 1314. Limiting these concepts to electronic messages does not make them inventive.

## II.    The '182 Patent

The '182 Patent describes a way of reducing the amount of back-and-forth in an instant messaging conversation. Specifically, instead of receiving confirmation about the status of each message sent in a conversation (*e.g.*, whether the message has been delivered or read by the recipient), the sender of the messages just receives a confirmation about the status of one of those messages—typically the last—and infers the status of other messages that were sent before that one. BlackBerry specifically asserts Claims 1 and 4. Compl. ¶ 178. Claim 1, which is merely Claim 4 drafted as a method claim, is recited below with key portions bolded:[1]

> 1. A method in a first communication device for **reducing communications in an instant messaging conversation** between said first device and a second communication device, the method comprising:
>
> **sending to said second device, a plurality of instant messages** of said conversation;
>
> **receiving from said second device, after sending said plurality of instant messages, at least a notification of the status of only a particular one of said plurality of instant messages** sent by said first device to said second device without having previously received a notification of the status of any of said plurality of instant messages sent prior to said particular one of said plurality of instant messages; and

---

[1] The § 101 analysis may be performed using a representative claim that is "substantially similar and linked to the same abstract idea," *Content Extraction & Transmission LLC* v. *Wells Fargo Bank*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *see Alice*, 573 U.S. at 226–27 (holding the system and computer-readable medium claims to be no different in substance from the method claims for the § 101 analysis).

> in response to receipt of said notification, a processor **updating an internal record** to reflect said status for said particular one of said plurality of instant messages and **to reflect an inferred status for all of said plurality of instant messages of said conversation sent prior to said particular one of said plurality of instant messages**.

The specification defines an "instant message" (or "IM") exactly as it is commonly understood—a short text message sent from one device to another, generally displayed as "part of a conversation." '182 Patent at 1:6–9. The patent does not purport to have invented IMs or notifications for IMs, stating that IM systems were known to provide users with a "notification of the status" of a message. *Id.* at 1:22–23. These known IM systems "used notifications to provide users with 'clues'" about the status of particular messages, such as whether a message was delivered to or read by the recipient. *Id.* at 1:22–29.

The patent purports to use these "clues" to "reduc[e] the communications in an IM conversation" by "sending to the second device a single IM communication that confirms the most recent of events." *Id.* at 2:12–16. The specification further explains that "[i]n some cases, [the status of] an earlier event can be inferred from the single IM communication." *Id.* at 2:27–28. For example, upon notification that a particular IM has been read, the device that sent the IM "may infer that all previous instant messages in the conversation that were sent" have also been received and read. *Id.* at 2:65–3:3. The sending device then "update[s] its internal record to reflect that the particular IM and all messages of the conversation sent prior to the particular IM were delivered and read." *Id.* at 3:3–6.

**A. The '182 Patent Claims Are Directed to the Abstract Idea of Inferring the Status of Messages in a Conversation**

Claims 1 and 4 of the '182 Patent are directed to nothing more than the abstract idea of inferring the status of messages in a conversation, such as whether the messages have been delivered or read. The claimed method seeks to reduce the amount of back-and-forth in a conversation by relying on a single response in a

conversation to infer the delivered or read status (or some other status of interest) of earlier communications in the conversation.  But such use of inferences is a basic aspect of human conversation, one that merely involves "analyzing information by steps people go through in their minds."  *Elec. Power*, 830 F.3d at 1354.  As an example, a father might convey a list of items to his son to pick up from the grocery store, but rather than repeatedly (and tediously) respond "I got it" to each item, the son can just say "I got it" in response to the last item his father lists.  The father can then take mental note that the son has heard the entire list.  This is not a technological solution to address a technological problem.

The purely result-based, functional language to describe the purported invention further evidences its non-technological nature.  "Sending" and "receiving" messages or notifications constitute the broken-down steps of a two-way conversation.  "Updating an internal record" constitutes the act of keeping track of the conversation.  These are all generic processes, not just in the instant messaging context, but also in the human context.  *See Two-Way Media Ltd.* v. *Comcast Cable Commc'ns*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (finding a claim reciting "a method for transmitting message packets over a communications network" to be directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring receipt of the sent information, and (4) accumulating records about receipt of the sent information" and explaining that these are all examples of result-based functional language).  Indeed, it is telling that other than the "first communication device," "second communication device," and arguably "processor," the claims do not cite to any hardware.  At best, the claims recite an existing form of efficient communication, performed via generic computing technology.

### B. The '182 Patent Claims Add No Inventive Concept

Nor do Claims 1 and 4 offer any details that could transform the claimed abstract idea into something "significantly more."  *Alice*, 573 U.S. at 218.  The claims only recite routine, conventional activities such as sending messages, receiving

notifications, and updating internal records.  In addition, each limitation is recited so generally that they are themselves abstract elements, as discussed above, and thus do not supply an inventive concept.  *See SAP Am.*, 898 F.3d at 1169–70; *Two-Way Media*, 874 F.3d at 1337 (sending, receiving, and making a record are abstract ideas). In fact, the claims do not even recite an actual step of "inferring" the status of a message.  The claims only recite "updating an internal record" to "reflect an inferred status," which is exactly the type of result-based functional language that is indicative of a claim directed to an abstract idea.  '182 Patent at 9:48–51; *Two-Way Media*, 874 F.3d at 1337 (explaining that "accumulating records about receipt of the sent information" is an example of result-based functional language).  The claims point to no technological, let alone unconventional, details for carrying out the required steps—none of the steps, alone or together, suffice to transform the abstract idea into patent-eligible subject matter.

## III.   The '059 Patent

The '059 Patent generally relates to a method of providing notice of available informational content from one mobile device to another through a networked hub server.  BlackBerry specifically asserts Claims 1, 11, and 16.  Compl. ¶ 124.  Claim 1, which is a method claim that recites the acts of the claimed apparatuses of Claims 11 and 16, is representative.  It is recited below with key portions bolded:

> 1. A method comprising:
>
> making informational content, selected in a first mobile wireless device, available to a second mobile wireless device using a data hub server;
>
> **receiving a representation of the informational content in the data hub server in a directed transmission from a first server to the data hub server**, the first mobile wireless device being a client of the first server; and
>
> **transmitting notification of the informational content being available to the second mobile wireless device using a directed transmission from the data hub server to a second server**, the second mobile wireless device being a client of the second server, the first server being separate from the second server.

BlackBerry did not invent the computer network or network servers. It also cannot claim to have invented a new type of network server for this patent. As the specification explains, a "server" is a device that can communicate with the Internet and other servers using traditional and generic computer components, such as processors, memory, and a network interface. *Id.* at 19:36–58, Fig. 7; *see also id.* at 3:40–60, 9:10–27; *Credit Acceptance Corp.* v. *Westlake Servs.*, 859 F.3d 1044, 1056 (Fed. Cir. 2017) (noting a database, user terminal, and server are conventional and generic). Although the patent also refers to transmitting information through a "data hub server," this server is just a "go-between server." '059 Patent at 19:53–58, 20:4–9. The specification describes the "data hub server" generically like any other server, as a device with processors, memory, and a network interface that can communicate with the Internet and other servers. *Id.* at 18:29–19:35; *see also id.* at 15:16–18 (noting that the "data hub server" can simply be "a server" that is "external to the wireless servers" (the first and second servers)).

## A. The '059 Patent Claims Are Directed to the Abstract Idea of Communicating the Availability of Content Through a Networked Hub

The identified claims of the '059 Patent are directed to the abstract idea of communicating the availability of content through a networked hub. As depicted in Figure 5, the claims essentially boil down to a first mobile wireless device transmitting information (or a representation of that information) to a "data hub server" through a first server, then the "data hub server"



*FIG. 5*

transmitting a notification of the availability of that information through a second server to a second mobile wireless device.  Indeed, the acts of transmitting and receiving information are in and of themselves abstract ideas.  *See*, *e.g*., *Two-Way Media*, 874 F.3d at 1337 (sending and directing information over a network are abstract ideas).

Although the claims refer to mobile wireless devices and servers, the claims are not directed to a technological solution specific to a technological problem.  This is apparent from the real-life brick-and-mortar implementation of this idea using the postal system.  When one person wants to send a large package to another, the first person hands the package to a postal carrier who then delivers the package to the post office (much like transmitting information from a first device through a first server to the data hub server), then the post office sends another postal carrier to provide a paper notice to the second person that the package is available for pick-up (much like sending a notification of the availability of the information from the data hub server through a second server to the second device).

Even as applied in the realm of computers, however, the Federal Circuit has already explained in *ChargePoint*, just earlier this year, that communication over a network for interacting with a device is an abstract concept.  *ChargePoint,* 920 F.3d at 768.  In particular, *ChargePoint* makes clear that "communicating requests to a remote server" and "receiving communications from that server" are abstract ideas.  *Id.* at 766.  The '059 claims are directed to exactly these ideas, where a first device communicates with networked servers to transmit information and a second device receives communications about the availability of that information from the networked servers, all using standard networking components and protocols.  *See, e.g*., '059 Patent at 5:10–13, 14:24–27 ("interconnected computer networks that interchange data using a standardized protocol[, like the] Internet"); *id.* at 19:3–13, 20:26–33 (describing generic servers that operate on well-known networks such as the Internet); *see also id.* at 3:61–28 (describing generic instrumentalities); *id.* at 6:50–

52 (noting generically that the wireless server "may be realized as software integrated into a machine"); *id.* at 10:47–49 (noting generically that a local home PC can be configured as a wireless server).

### B. The '059 Patent Claims Add No Inventive Concept

The claims do not present any saving inventive concept because they merely implement the abstract idea by using generic computer networking components (*i.e.*, mobile wireless devices and servers) that are performing generic computer networking functionalities (*i.e.*, making information available, receiving information, and transmitting information). The components in combination are a conventional networking unit, as discussed above. "That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive." *buySAFE, Inc.* v. *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *see also Credit Acceptance*, 859 F.3d at 1056 (noting that databases, user terminals, and servers are conventional and generic).

The fact that the claims use the term "data hub server" to refer to the claimed intermediary server, as opposed to just the term "server," does not change the analysis. As discussed above, the description of the data hub server in the specification provides no suggestion that the data hub server is "anything other than off-the-shelf, conventional computer [and] network technology." *Elec. Power*, 830 F.3d at 1355.

Likewise, the fact that the claims specify that the data hub server receives an abstract "representation of the informational content" and transmits a "notification of the informational content" does not make the server functionality any less routine and conventional. The specification does not at all suggest that conveying either a representation of or a notification about information content is somehow non-routine or unconventional. And, as the Federal Circuit has held, the claims are not made any less abstract just because the claims specify the particular types of information to be communicated (here, a "representation of the informational content" and a "notification of the informational content"). *See SAP Am.*, 898 F.3d at 1168

(collecting and analyzing information is abstract, even when limited to a particular type of information).  Rather, providing notifications and using representations (e.g., a shorthand) for information are themselves abstract concepts.  *See FairWarning*, 839 F.3d at 1094 (notification); *OpenTV, Inc.* v. *Apple, Inc.*, 14-cv-01622-HSG, 2015 WL 1535328, at *3–*4 (N.D. Cal. Apr. 6, 2015) (shorthand).  And notably, the specification discloses that the "representation of the informational content" is generic enough to cover the informational content itself.  '059 Patent at 26:33–45, 27:41–54.  In any event, merely generating, sending, or transmitting a notification are all well-worn abstract ideas in and of themselves, and therefore do not connote subject matter eligibility.  *See FairWarning*, 839 F.3d at 1094–95 (notifying is abstract); *SAP Am.*, 898 F.3d at 1169–70 (noting elements "are themselves abstract"); *Two-Way Media*, 874 F.3d at 1337 (sending, directing, and monitoring information are abstract ideas); *see also* '059 Patent at 17:46–55, 23:19–25, 23:67–24:4 (noting generically that a notification can be generated, sent, or transmitted).  Accordingly, none of the claim elements of the '059 Patent, alone or in combination, provides an inventive concept.

## IV.    The '777 Patent

The '777 Patent purports to combat the problem of "unrestrained dissemination" of "undesirable" communications by "throttling" or delaying the delivery of that communication.  *See* '777 Patent at 1:27-58, 5:9-21, 5:61-64.  Yet none of BlackBerry's identified claims actually offers a technological solution to this decidedly non-technological problem.  Rather, the claims simply posit that certain unspecified thresholds can be used to identify ***some category of repetitive*** content—not necessarily just undesirable content—for which notifications should be adjusted.

Claim 1, which is representative of specifically asserted Claims 1, 10, and 19, is presented below with key portions bolded:

> 1. A method of managing electronic communications within a social group of a social network, comprising:
>
> **monitoring messages** communicated within the social group;

**determining content shared by a number of messages** communicated within the social group, wherein the number of messages sharing the determined content **satisfies at least one of**:

a growth rate of the number of messages **meets or exceeds a growth rate threshold**; and

the number of messages **meets or exceeds a message quantity threshold**;

**determining whether one or more new messages** to be communicated to one or more members of the social group **comprises content similar to the determined content**; and

**selectively adjusting notification of the one or more new messages** to the one or more members of the social group in response to determining that the one or more new messages to be communicated to the one or more members of the social group comprises content similar to the determined content.

**A. The '777 Patent Claims Are Directed to the Abstract Idea of**

**Screening Repetitive Content When It Becomes Excessive**

Despite what the specification might contend is the purported solution to the problem it posits, the claims themselves are not so focused. Instead, they are directed only to the abstract idea of screening repetitive content when it becomes excessive. This is hardly a technological solution to a technological problem.

The Federal Circuit's decision in *Symantec* is instructive. In that case, the claims at issue involved "methods of routing e-mail messages based on specified criteria (*i.e.*, rules)." 838 F.3d at 1317. More specifically, the claims recited applying a set of business rules for "controlling the delivery of an e-mail message as a function of an attribute of the e-mail message." *Id.* at 1318. The Federal Circuit likened the claims in that case to the application of business rules by a corporate mailroom to define what action to take on a particular correspondence, such as deferring delivery or gating a message for further review. *Id.* Although the claims included additional limitations, such as combining the e-mail with a "rule history" of all the rules applied to that e-mail, the Federal Circuit nonetheless determined that the claims were merely directed to a "conventional business practice" of "screening messages by a corporate organization." *Id.*

That same reasoning applies here. Similar to the *Symantec* claims, the claims

at issue recite methods of "selectively adjusting notification" for a new message, including by delaying delivery, based on whether the message meets one of two specified criteria.  And similar to the *Symantec* claims, the claimed criteria are readily applied to adjust notifications for new messages in non-technological settings.  For example, when a city council member's office is suddenly deluged with calls relating to a newly controversial issue, her staffers can note the surge in activity and report the calls on an aggregated and delayed basis instead of immediately relaying each message.  There are numerous other examples as well: solicitations for alumni donations can be sequestered to certain times of the year instead of all throughout the year; spam email can be reserved for delivery at the end of the day in a single digest instead of being instantly delivered to the recipient; trial exhibits with similar content can be moved into evidence en masse at the end of the court day instead of one by one as each exhibit is introduced to the jury.

The abstract nature of these patent claims is further highlighted by the fact that the claim elements are "so result-based that they amount[] to patenting the patent-ineligible concept itself."  *Interval Licensing LLC* v. *AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) (finding patent-ineligible a claim with nine "generic sets of instructions" that distilled down to two results-based functions).  Tellingly, the claims do not specify how to determine when a message or content has met the claimed criteria.  At best, the specification invokes the use of "natural language parsing capabilities" already known to those of skill in the art, but the claims do not recite any advancement in parsing capabilities or their application.  *See, e.g.*, '777 Patent at 5:50-53, 9:4-8.  The claims also do not specify how to selectively adjust notifications for a new message based on that repetitive content.  Of particular note, the claims do not even specify **what** or **how much** adjustment to make.  *See Facebook/Snap*, 2018 WL 4847053 at *6 (finding ineligible a patent claim directed to time stamping where the language of the challenged claim is "broad enough that it would cover embodiments that may not actually improve when timestamp information is displayed").

The § 101 inquiry must be focused on what is actually claimed.  *See ChargePoint,* 920 F.3d at 768 (when analyzing subject matter eligibility, "the specification cannot be used to import details from the specification if those details are not claimed").  Here, at best, the claims are a list of functions without boundaries.  That cannot be patent-eligible.  *See Interval Licensing*, 896 F.3d at 1343 (stressing that "a claimed invention must embody a concrete solution to a problem having 'the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it.'") (internal citations omitted); *see also SAP*, 890 F.3d at 1021-23 (collecting cases).

### B. The '777 Patent Claims Add No Inventive Concept

Turning to step two of *Alice*, the claims fail once again—the claim limitations, both alone and in combination, do not contain any saving inventive concept.  To start, but for the preamble reciting the management of "electronic communications," no part of Claim 1 recites anything that is arguably technological.  As explained above, the limitations only describe results-based functions.  Consequently, these limitations fail to pass muster because they amount to "patenting the patent-ineligible concept itself."  *Interval Licensing*, 896 F.3d at 1344.  That the limitations do not recite "assertedly inventive technology for improving computers as tools" only further drives home the point.  *Id.*; *see also Elec. Power Grp.*, 830 F.3d at 1354 (finding claims ineligible in part because no "particular tool" was identified).

Claims 10 and 19 fare no better, merely grafting standard computer components onto the patent-ineligible method of Claim 1.  But that is not enough.  *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (holding that, despite reciting "concrete, tangible components," the claims were directed to an abstract idea where "the physical components merely provide[d] a generic environment in which to carry out the abstract idea").  While Claim 10 recites the use of a "social network server coupled to a communications network," the specification makes clear that the "social network server" is a conventional structure that can take the form of a

"Network Operations Center," which "commonly are responsible for monitoring communications network sand user activity in a social network for alarms or other conditions that require attention." '777 Patent at 4:38-42, 8:23-26. The "social network server" is thus just a server functioning in a social network, much like a mail delivery truck is just a truck that delivers mail. Claim 19 similarly only adds the use of an equally generic non-transitory computer-readable medium for causing a server with a processor and associated memory to perform the claimed steps. *See FairWarning*, 839 F.3d at 1096 (where method claims were patent-ineligible, similar apparatus claims that added "nominal recitations of basic computer hardware, such as 'a non-transitory computer-readable medium with computer-executable instructions' and a microprocessor" meant that the "conclusion of ineligibility is inescapable") (quoting *Accenture Glob. Servs., GmbH* v. *Guidewire Software, Inc*., 728 F.3d 1336, 1344 (Fed. Cir. 2013)). And, in any event, both claims make clear that it is simply a generic processor coupled with a memory that actually performs the required steps. *See* '777 Patent at 13:23-26.

Those steps cannot be considered unconventional computer functions either. This is confirmed by the fact that the specification fails to describe any technical challenge or technical improvement to the way that the claimed computer components operate. *ChargePoint*, 920 F.3d at 768; *TLI*, 823 F.3d at 612. Indeed, the specification is conspicuously silent about any technological advances in the architecture or function of the claimed processor and memory, explaining that "well-known methods, procedures, and components have not been described in detail to avoid obscuring the embodiments described." '777 Patent at 2:50-52. In effect, the addition of these technological components does nothing more than simply state the abstract idea while "adding the words 'apply it.'" *Alice*, 573 U.S. at 221. The patent claims are thus fatally abstract.

## V.   The '351 and '929 Patents (the "Advertising Patents")

BlackBerry specifically asserts Claims 1 and 14 of the '351 Patent, and Claims

1, 2, 9, and 10 of the '929 Patent.[2]  Compl. ¶¶ 74, 90.  As the Court is aware from *Facebook/Snap*, the Advertising Patents share a common specification and generally relate to a system and method for sorting, storing, selecting, assembling, and delivering targeted advertising.  The '351 Patent in particular covers assembling different kinds of advertising; the '929 Patent covers assembling content with targeted advertising using a meta tag.

Claim 1 of the '351 Patent is "exemplary" of the asserted claims from that patent (Compl. ¶ 92), and is recited below with key parts bolded:

1. A system for pushing information to a mobile device, comprising:

a **proxy content server** that **receives information** over a computer network from an information source **and stores the information to one of a plurality of channels based on pre-defined information categories**, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database;

the proxy content server to **receive a feedback signal** over a wireless network that indicates a position of the mobile device, and to **use the feedback signal to select a channel for transmission of the information** from the selected channel over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin.[3]

Claim 9 of the '929 Patent is "exemplary" of the asserted claims from that patent (Compl. ¶ 76), recited as below with key parts bolded:

---

[2] This Court has found Claim 2 of the '929 Patent to be invalid and thus this claim is improperly asserted.  *Facebook/Snap*, 18-cv-01844, Dkt. No. 157 at 17–19 [hereinafter "*Facebook/Snap* Claim Construction"].  Claim 10 is improperly asserted for the same reasons.

[3] Claim 14 is identical to Claim 1 except that its triggers for selecting targeted advertising are not limited to the recipient's location.

9. A **server**, comprising:

a database organized into a plurality of memory location channels, each of the memory location channels **storing information of a same category as a pre-defined category of each of the respective memory location channels**,

wherein upon detection of

a triggering event comprising a **time triggering event**, determining the information relevant to the detected triggering event from among information stored in one of the plurality of memory location channels of the database, **when the information relevant to the detected triggering event comprises content information, inserting into the content information a meta tag for one or more advertisements to be displayed with the content informatio**n, and transmitting the content information that includes the meta tag to a mobile device,

wherein the **meta tag identifies the one or more advertisements and advertisement display requirements**, and wherein the one or more **advertisements are selected based on the detected triggering event**.

## A. The Advertising Patent Claims Are Directed to the Abstract Idea of Assembling Targeted Advertising

These claims are not directed to a "specific 'improved architecture' provided by a 'proxy content server,'" as BlackBerry previously argued to this Court. *Facebook/Snap*, 2018 WL 4847053 at \*6.  This is apparent from the fact that the specification lacks any detail establishing a technical challenge, much less a technical improvement, in the way that the proxy content server gathers information, stores information, and selects information in response to a feedback signal.  *ChargePoint*, 920 F.3d at 768; *see also TLI*, 823 F.3d at 612 (holding patent claims ineligible where the specification "fail[ed] to provide any technical details for the tangible components, but instead predominately describe[d] the system and methods in purely functional terms"); *see id.* at 612–13 (concluding that "the focus of the patentee and of the claims was not on" improved hardware because the specification described the functionality of the hardware "in vague terms without any meaningful limitations").

If anything, the specification shows the opposite.  The specification describes the alleged invention as a "method of combining the information so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content."  '351 Patent at 2:63–66.  The specification also notes that "[o]ne possible goal of combining information with advertising content is to achieve a revenue source for the provider of the information so the mobile device user gets a reduce [sic] or free information service."  *Id.* at 3:16–19.  Neither of these relates to an improved server architecture, however, regardless of whether you call it a "proxy content server" (as in the '351 Patent) or just a "server" (as in the '929 Patent).

Thus, when properly viewed in the context of the specification, the focus of the asserted claims is on the fundamental business practice of assembling targeted advertising, whether by assembling different types of advertising information ('351 Patent) or assembling placeholders for advertising with content information ('929 Patent).  But this is a patent-ineligible abstract idea.  Targeted advertising, as the Federal Circuit has noted, has long been in use in a variety of non-electronic settings, including radio stations, newspapers, magazines, highway billboards, bulletin boards, and information bulletins.  *See Capital One*, 792 F.3d at 1370 (stating that targeted television commercials have been around "for decades").  The Federal Circuit thus has held that "[t]ailoring information based on the time of day of viewing" or "based on the viewer's location" is each "an abstract, overly broad concept long-practiced in our society."  *Id.* at 1369–70.  That same principle applies to advertising tailored based on any trigger, not just time and location.  *See, e.g.*, *OpenTV, Inc.* v. *Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014) ("[T]he concept of gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'").

The abstract nature of the patent claims is further confirmed by the fact that a human could perform the claimed steps mentally or with pen and paper (and, indeed,

long has).  Imagine a newspaper editor receives a reminder, much like a "feedback signal" or "triggering event," that prompts her to prepare the Weekend edition.  She composes the Weekend Entertainment section by assembling a layout for the newspaper with articles selected from various categories pertinent to the weekend (*e.g.*, reviews of newly released movies).  In the layout she includes placeholder blocks, much like "meta tags," that specify where relevant advertisements (*e.g.*, a special offer at a restaurant or theater) will be inserted.  These placeholder blocks indicate, for example, the size of the advertisement to be inserted or whether it should be printed in color rather than black-and-white, akin to the claimed "display requirements."

Twitter recognizes that the Court, in declining to invalidate the Advertising Patents in *Facebook/Snap*, found the claims akin to the claims upheld in *Core Wireless*.  However, the Federal Circuit recently confirmed that the *Core Wireless* claims were upheld as claims that "improve the functioning of the computer, make it operate more efficiently, or solve any technological problem."  *Trading Techs.*, 921 F.3d at 1093.  Thus, *Core Wireless* is inapposite here, where the Advertising Patents do not claim to "improve the functioning of [a server], make it operate more efficiently, or solve any technological problem."  *Id.*

### B. The Advertising Patent Claims Add No Inventive Concept

The claims of the Advertising Patents do not supply an inventive concept because they do no more than employ generic computer components to perform generic computer functions, such as gathering, storing, selecting, assembling, and transmitting information.  Importantly, the claim construction proceedings in *Facebook/Snap* have voided BlackBerry's prior eligibility arguments to this Court. In light of these new developments, Twitter respectfully submits that this Court should reject BlackBerry's previous arguments that the claimed servers add "significantly more" by (1) "organizing data into memory location channels," (2) "transmitting specific data based on a triggering event," and (3) "adding a meta tag to the data for

transmission." *Facebook/Snap*, 2018 WL 4847053 at *8.

First, contrary to BlackBerry's earlier contentions, there is nothing unconventional about the servers organizing advertising information into a "plurality of memory location channels" based on pre-defined categories. As BlackBerry has since admitted, a "memory location channel" (or "channel") is just a "memory location." *BlackBerry Ltd. v. Facebook, Inc.*, No. 2:18-cv-01844-GW-KS (C.D. Cal. Apr. 5, 2019), ECF No. 157, at 9 ("*Facebook/Snap* Claim Construction"). Thus this claimed function merely refers to sorting and storing advertising information by category. This is, at its core, an abstract idea and not an inventive concept. *See, e.g.*, *Elec. Power*, 830 F.3d at 1354 (collecting and analyzing information is abstract).

Second, given that "memory location channel" simply refers to a location for storing data, this Court should also reject BlackBerry's prior argument that there is something inventive about transmitting specific data selected from a "memory location channel" based on a feedback signal or triggering event. *Facebook/Snap*, 2018 WL 4847053, at *6. As discussed above, courts have repeatedly recognized that tailoring content is a long-prevalent fundamental practice. Furthermore, "[s]electing particular data to send to a mobile device based on an event or signal," *Facebook/Snap*, 2018 WL 4847053 at *7 n.6, is part of the abstract idea here—indeed, the very essence of targeted advertising—and therefore cannot supply the inventive concept as a matter of law. *See BSG*, 899 F.3d at 1291. The additional fact that the tailored content was selected from a memory location is hardly transformative.

Third, the use of the claimed "meta tag" does not provide an inventive concept for the '929 Patent either. As the Court rightly recognized during the claim construction proceedings, the "meta tag" identifies an advertisement and its display requirements, and is inserted into and transmitted with the content information. *Facebook/Snap* Claim Construction at 13–17. But those acts are all generic functionalities of data organization that cannot confer patent-eligibility.

Using a meta tag to identify where to display advertising is not inventive. Here,

the meta tag functions as a "reference value" that refers to the advertisement, '929 Patent at 12:11–14, and such a function is conventional. *See, e.g., Essociate, Inc.* v. *Clickbooth.com, LLC*, No. 13-cv-01886-JVS(DFMx), 2015 WL 1428919, at *8 (C.D. Cal. Feb. 11, 2015) ("assigning of unique identification codes . . . describe[s] routine, conventional activity"). Indeed, the specification discloses that meta tags "indicate when advertising should be inserted" without mentioning any associated technical challenges or improvements. '929 Patent at 8:33–35; *ChargePoint*, 920 F.3d at 768.

That the meta tag, instead of the advertisement itself, is inserted into and transmitted with content information is also not inventive. This is part of the abstract idea itself—specifically, here, the act of ***assembling*** targeted advertising. *See BSG*, 899 F.3d at 1290 ("a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept"). The specification concedes that "[t]he insertion of meta tags is performed" using "standard techniques." '929 Patent at 12:2–11.

In sum, even though the Advertising Patents use seemingly technical phrases, such as "proxy content server," "memory location channel," and "meta tag," these terms simply refer to commonplace computer components—a server, a storage location, and an identifier. *Smart Sys. Innovations, LLC* v. *Chicago Transit Auth.*, 873 F.3d 1364, 1371–72 (Fed. Cir. 2017) (finding claims directed to the abstract idea of "collection, storage, and recognition of data" despite the claims' use of the "typically obtuse syntax of patents" and "technical jargon" such as "identifying token" and "timepass record"). None of the claim elements here, either alone or in combination, provides an inventive concept beyond the abstract idea of assembling targeted advertising.

## VI. The '120 Patent

As this Court previously described, the '120 Patent relates to a method for "silencing messages in a thread if they have been flagged as silenced and reciting how those messages are displayed in the inbox." *Facebook/Snap*, 2018 WL 4847053 at

*14.  Put another way, the patent relates to a method for announcing and presenting new messages (such as with a notification alert or through a different visual presentation) according to whether the message is part of a silenced message thread. BlackBerry specifically asserts Claims 1, 13, and 24.  Compl. ¶ 99.  Claim 13, which is a method claim that recites the acts of the claimed apparatuses of Claims 1 and 24, is representative.  It is reproduced below with key portions bolded:

> 13.  A method for silencing notifications for incoming electronic messages to a communication system, the communication system comprising a data processor, media readable by the data processor and a communications subsystem, the communications subsystem adapted to receive the incoming electronic messages, the method comprising:
>
> receiving one or more selected message threads for silencing;
>
> in response to receiving the one or more selected message threads, **activating one or more flags**, each flag in association with a selected message thread of the one or more selected message threads, **wherein the one or more flags indicate that the associated one or more selected message threads have been silenced**;
>
> receiving a new incoming electronic message;
>
> **identifying the new incoming message as associated with the selected one or more message threads**;
>
> **determining that a message thread associated with the new incoming message has been flagged as silenced** using the one or more flags;
>
> **overriding at least one currently-enabled notification setting** to prevent a notification pertaining to receipt of the new incoming message from being activated; and
>
> **displaying the new incoming electronic message in an inbox** together with any message thread not flagged as silenced, while **silencing any further notifications** pertaining to receipt of the new incoming electronic message;
>
> wherein **the new incoming message thread flagged as silenced is displayed in the inbox in a different manner** than any message thread not flagged as silenced.

Fig. 6 illustrates the decision tree of the claimed method. A new message is received (602), then sorted into a new or existing thread (604, 610), and based on whether that thread has been marked for silencing (612), the new message is either presented with no notification but grayed out (614) or presented with a notification and displayed like other messages in the inbox (616).



FIG. 6

As the specification concedes, email applications such as Microsoft Outlook and other messaging applications were standard and well-known. '120 Patent at 8:39–44. These applications commonly organize messages into groups or "message threads." *Id.* at 1:22–28, 11:61–12:1. These groupings can be based on common subject matter or topics of "conversation." *Id.* at 1:24–28. The specification also notes that messages and message threads can be organized by tagging or marking them with a "flag," or identifier. *See, e.g.*, *id.* at 8:31–39, 8:39–44, 9:35–38, 11:18–20, 11:43–47, 13:9–12, 13:51–53.

The specification explains that a notification setting for alerting users of a new message can be overridden if the new message is associated with a thread that has been marked for silencing. "[W]hen a user silences a thread, the user will no longer receive notifications (e.g. ring tones, flashing lights or vibrations) when a new message arrives belonging to the silenced message thread." *Id.* at 13:19–22. These silenced threads are displayed in an inbox, just like all other threads, but in a visually distinct manner. The specification explains that this visual distinction can take any

form, including using different colors or fonts.  *Id.* at 13:28–37, 16:1–8.

### A. The '120 Patent Claims Are Directed to the Abstract Idea of Sorting, Analyzing, and Presenting New Messages

In its prior analysis, the Court noted that the *Alice* step one inquiry had to take into account the claims' recitation of displaying silenced messages in a different manner, and of a flag and override system for automatically identifying and silencing particular messages.  *Facebook/Snap*, 2018 WL 4847053 at *14.  With that in mind, Twitter submits that the claims of the '120 Patent are indeed all patent-ineligible.

Viewing the claims as a whole, as required, the claims of the '120 Patent are drawn to the abstract idea of sorting, analyzing, and presenting new messages.  More specifically, the claims are directed to sorting new messages into a related group or thread, and based on whether the thread has been marked for silencing, presenting the new messages in a different manner, both in terms of whether the new message triggers a notification and whether the new message is displayed differently from other messages.  These activities—sorting, marking, using rules, presenting—are all fundamental concepts of organizing data, just applied in the context of mail management.  *See, e.g.*, *Elec. Power*, 830 F.3d at 1354 (holding claims abstract that were directed to "gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions").  *See also Trading Techs.*, 921 F.3d at 1093 ("As a general rule, "the collection, organization, and display of two sets of information on a generic display device is abstract.") (internal citations omitted).

The *Symantec* case discussed above with respect to the '777 Patent is also instructive here.  The Federal Circuit affirmed the patent ineligibility of the claims at issue for being directed to "receiving, screening, and distributing e-mail."  *Symantec*, 838 F.3d at 1316–17.  The Federal Circuit also noted that corporate mailrooms perform those very same functions by applying business rules for taking certain actions on correspondence, such as gating a message for further review or just

releasing the message.  *Id.* at 1317.  While the *Symantec* patent purported to address the need to "control the flow" of information within an organization, the Federal Circuit found that description only further demonstrated that the claimed method was abstract.  *Id.* at 1317–18.  Here, the patent claims are likewise abstract for being directed to sorting new messages, applying rules to the messages based on how they were sorted, and acting on the messages based on application of those rules.

### B. The '120 Patent Claims Add No Inventive Concept

The claims also fail step two of *Alice*.  Although the Court previously noted a factual dispute as to whether (1) "activating flags for particular message threads," (2) "overriding currently-enabled notification settings," and (3) "displaying silenced messages in a particular manner" are claim elements drawn to well-understood, routine, or conventional concepts (*Facebook/Snap*, 2018 WL 4847053, at *14 n.16), further review shows that those elements—individually and in combination—fail to transform the abstract nature of the claims into a patent-eligible application.

First, the act of setting flags to indicate silenced message threads is both conventional and abstract.  The specification acknowledges that flags—described broadly as data items that can be used to identify, tag, mark, or organize data records like messages—were well-known and used by applications such as Microsoft Outlook.  *Id.* at 8:39–44; *see id.* at 8:31–39, 8:39–44, 9:35–38, 11:18–20, 11:43–47, 13:9–12, 13:51–53 (describing flags).  Nothing in the patent contains any suggestion of an unconventional use of flags in order to mark silenced message threads.  Indeed, the Federal Circuit has held that the use of data markers like tags to collect, identify, organize, classify, or otherwise filter data is an abstract idea in and of itself.  *See Intellectual Ventures I LLC* v. *Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017); *Symantec*, 838 F.3d at 1313–14 (using email identifiers is abstract).  Therefore, using flags cannot be an inventive concept.

Second, the act of overriding notifications for particular messages is also both conventional and abstract.  The patent specification teaches that notifications can be

overridden by simply employing generic computers components and capabilities—implemented with "software modules 306 resident in memory 300" and executed by a microprocessor, *i.e.*, software programming running on a generic computer. *See* '120 Patent at 9:32–67. The specification does not otherwise disclose any specific programming details or any technological difficulty in implementing the overriding step, which is to be expected. Overruling one rule in favor of another rule is hardly a technological feature. It is no different from asking an assistant to alert you about all incoming phone calls, but not if the caller is a telemarketer. Thus, this "additional step[] amount[s] to a basic logic determination of what to do given a user's preferences," which the Federal Circuit has said is insufficient to transform an abstract idea into patent-eligible subject matter. *Return Mail, Inc.* v. *USPS*, 868 F.3d 1350, 1369 (Fed. Cir. 2017).

Third, displaying messages in a particular manner is plainly conventional and abstract. The Federal Circuit has reiterated time and time again, including as recently as a few months ago, that displaying information is an abstract concept, even as a new arrangement of information that assists users in processing information. *Trading Techs.*, 921 F.3d at 1093–94. It is a fundamental aspect of using information and computer technology. Although the claims provide additional specificity that the messages are displayed in an inbox with other messages, and that the messages are displayed in a distinct manner from other messages, there is nothing unconventional about these extra details. Consistent with this, the '120 Patent only identifies the use of "typical" and generic graphic user interfaces to enact these different modes of display. *See, e.g.*, '120 Patent at 10:47–60, 10:57–63 (noting computers typically can display shaded and highlighted objects); *id.* at 11:11–13 (using "suitably-configured GUIs" for displaying silenced message threads); *id.* at 13:28–37, 16:1–8 (displaying a silenced message threads differently by simply greying (shading) them out).

BlackBerry alleges no other facts in its complaint to show that the patent claims are inventive. It makes the bare assertion that the claims are "not conventional, well-

understood, or routine" and then simply recites the claim elements.  This is an attempt to disguise attorney argument as factual allegations that the Court is not required to accept as true.   Accordingly, these claims do not present anything "significantly more" than the abstract idea.

## <u>CONCLUSION</u>

For the foregoing reasons, Twitter respectfully submits that BlackBerry's First Amended Complaint should be dismissed because all of the specifically identified asserted claims are invalid under § 101.

DATED:  June 25, 2019

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____ */s/ Nicholas Groombridge* _____
           Nicholas Groombridge

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

Attorneys for Defendant Twitter, Inc.