QUINN EMANUEL URQUHART &
SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
Yury Kapgan (Bar No. 218366)
yurykapgan@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Counsel for Plaintiff BlackBerry Limited

Jordan R. Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

BLACKBERRY CORPORATION
Edward R. McGah, Jr (Bar No. 97719)
emcgah@blackberry.com
Vice President, Deputy General
Counsel—Litigation
41 Ticknor Place
Laguna Niguel, CA 92677
Telephone: (650) 581-4750

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation, <br><br> Plaintiff, <br><br> v. <br><br> TWITTER, INC., a Delaware corporation, <br><br> Defendant. | Case No. 2:19-cv-01444-GW-KS <br><br> **BLACKBERRY LIMITED'S OPPOSITION TO TWITTER, INC.'S MOTION TO DISMISS** <br><br> Date: August 29, 2019 <br> Time: 8:30 a.m. <br> Courtroom: 9D <br> Hon. George H. Wu |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARD ..........................................................................5

III.  ARGUMENT .......................................................................................5

    A.    The '351 Patent Claims Eligible Subject Matter ...................................7

         1.    Step One: The Novel Technical Architecture Is Not Abstract.....7

         2.    Step Two: The Inventive Concept Precludes Dismissal ............11

    B.    The '929 Patent Claims Eligible Subject Matter ...............................13

         1.    Step One: The Novel Technical Architecture Is Not Abstract...13

         2.    Step Two: The Inventive Concept Precludes Dismissal ............14

    C.    The '120 Patent Claims Eligible Subject Matter ...............................15

         1.    Step One: The Novel Graphical User Interface Is Not Abstract................................................................................................15

         2.    Step Two: The Inventive Concept Precludes Dismissal ............17

    D.    The '089 Patent Claims Eligible Subject Matter ...............................18

         1.    Step One: The Novel Graphical User Interface Is Not Abstract................................................................................................18

         2.    Step Two: The Inventive Concept Precludes Dismissal ............19

    E.    The '182 Patent Claims Eligible Subject Matter ...............................20

         1.    Step One: The Novel Technical Architecture Is Not Abstract...20

         2.    Step Two: The Inventive Concept Precludes Dismissal ............22

    F.    The '059 Patent Claims Eligible Subject Matter ...............................23

         1.    Step One: The Novel Technical Architecture Is Not Abstract...23

         2.    Step Two: The Inventive Concept Precludes Dismissal ............25

G.  The '777 Patent Claims Eligible Subject Matter .................................26

  1.  Step One: The Novel Technical Architecture Is Not Abstract...26

  2.  Step Two: The Inventive Concept Precludes Dismissal ...........29

IV.  CONCLUSION ...............................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)................................................................*passim*

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ..............................................................................5, 6

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016)..........................................................25, 26

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012).....................................................................6

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) .............................................................. *passim*

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................5

*Berg v. Popham*,
    412 F.3d 1122 (9th Cir. 2005) ......................................................................5

*BlackBerry Ltd. v. Facebook, Inc.*,
    No. 18-1844, 2018 WL 4847053
    (C.D. Cal. Aug. 21, 2018) ...................................................... *passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    No. 18-1817, 2019 WL 2588278
    (Fed. Cir. June 25, 2019)...................................................... *passim*

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) ......................................................................24

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018)...................................................... *passim*

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018)...................................................... *passim*

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)...................................................... *passim*

*Dynamic Digital Depth Research PTY Ltd. v. LG Elecs., Inc.*,
    No. 15-5578, 2016 WL 7444561 (C.D. Cal. June 6, 2016) ...........................7

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016).......................................................... 12, 16

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)..........................................................30

-iii-                    CASE NO. 2:19-CV-01444-GW-KS

*Enfish, LLC v. Microsoft Corp.*,
    822 F. 3d 1327 (Fed. Cir. 2016) .................................................. *passim*

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ..................................................................... 5

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016) ................................................. 19, 20

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ................................................. 10, 27

*IBG LLC v. Trading Techs. Int'l, Inc.*,
    757 F. App'x 1004 (Fed. Cir. 2019) ........................................... 27, 29

*Intellectual Ventures I LLC v. Capital One Bank* (USA),
    792 F.3d 1363 (Fed. Cir. 2015) ................................................. 11

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ................................................. 16, 28

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ................................................. 28

*McRo, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ................................................. 11, 29

*OpenTV, Inc. v. Netflix Inc.*,
    76 F. Supp. 3d 886 (N.D. Cal. 2014) ......................................... 11

*Research Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ................................................... 22, 29

*SAP America, Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ................................................. 25

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    918 F.3d 1368 (Fed. Cir. 2019) ................................................. 10

*Trading Techs. Int'l, Inc. v. CQG, INC.*,
    675 F. App'x 1001 (Fed. Cir. 2017) ........................................... 9, 10, 16

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019) ................................................. 9, 19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ................................................. 21

*Zeroclick, LLC v. Apple Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018) ................................................. 6

## **Statutory Authorities**

35 U.S.C. § 282 ............................................................................. 5

## I.     INTRODUCTION

Twitter's Motion fails to address the concrete technological improvements of the subject inventions.   Indeed, this Court previously rejected Facebook and Snap's identical attempts to invalidate three of the same patents at issue here.[1]   For all seven patents at issue, Twitter improperly characterizes the claims at a higher level of abstraction than permitted under relevant precedent, and glosses over key claim terms and their technological nature.   Twitter also improperly draws all inferences in its own favor, and ignores factual disputes precluding dismissal at this stage.   As set forth in BlackBerry's pleadings, the inventions here comprise non-abstract, novel architectures and specific methods to solve technological problems that arose in the context of wireless communications systems, mobile phones and online social networks.

The '351 and '929 patents (which this Court has previously upheld) describe a novel architecture for packaging and delivering content and advertising information to mobile devices in a faster and more efficient manner than previously possible.   The inventors were faced with a technological problem of how to efficiently transmit data to mobile devices with limited processing power, bandwidth and battery life in 2001 and 2002.   At that time, information on the Internet was designed for delivery and display on desktop computers, not mobile devices.   To address the constraints of such devices, these inventions reduce the bandwidth and time required for mobile phone users to consume content and advertisements.   For example, the inventions make only relevant portions of information available to a mobile device based on specific criteria.   These inventions solve specific technological problems that arose in the context of resource-constrained mobile communications and the Internet; they are not some abstract idea or series of steps that can be performed mentally or with pen and paper.   Twitter's assertion that the claims do no more than sort and store information amounts to an

---

[1]   *BlackBerry Ltd. v. Facebook, Inc.*, No. 18-1844, 2018 WL 4847053, at *5-8, *14-15 (C.D. Cal. Aug. 21, 2018) (Wu, J.).

improper description of the claims at a high level of abstraction and untethered from the claim language—an approach that both the Federal Circuit and this Court have rejected.

The '120 patent (which this Court has held to be "drawn to a technological improvement over other communication device messaging systems rather than . . . to an abstract idea") addresses a problem that became acute largely after the popularization of smartphones—namely incessant new message notifications. The invention permits users to selectively silence such notifications on a per-thread basis, suppressing notifications for only some rather than all communications. It does so by enabling users to selectively override notification settings and to display silenced messages in a visually distinct manner on the device—a specific and substantial improvement over the all-or-nothing approach in prior messaging systems. Twitter's claim that the invention is directed to the abstract idea of sorting, analyzing, and presenting new messages again improperly glosses over specific claim elements and ignores the problem that the invention solves and how it does so.

The '089 patent was the result of a rather counterintuitive observation made by its inventors: the proliferation of electronic messages for many mobile phone users rendered largely useless the prior art system of displaying a numeric count to convey the number of new, unopened messages in the user's inbox. The count could become so large as to be ultimately overwhelming or irrelevant. The inventors addressed this issue with a novel communications system that displays a new message indicator on a home screen of the device or application when a new message is received, and resets the indicator when the device switches from the home screen to a screen that contains a list and preview of received messages (*e.g.*, an inbox) even if the user does not open the new message. Thus, after exiting the inbox, the user knows that any subsequent change in the new message indicator indicates the arrival of new messages, not merely that unopened messages are in the user's inbox. This obviates the need for users with a large number of unopened messages to constantly check their inbox to determine whether a new message was received. Twitter ignores applicable precedent to argue the

patent is abstract, but like other patents the Federal Circuit has upheld, the '089 patent is directed to a particular manner of summarizing and presenting information in electronic devices—a specific improvement to conventionally programmed behavior in prior art graphical user interfaces. It is thus not an abstract idea.

The '182 patent reduces redundant notifications in electronic messaging systems based on a novel architecture. Prior to this invention, electronic messaging systems provided senders with notifications for *each* sent message, such as that the message was delivered or read. This required bandwidth and resources that otherwise could have been used for other communications. The invention optimizes electronic messaging systems by *limiting* status notifications to the last sent of a number of messages and *inferring* the status for the earlier messages, thereby providing the sender a single status notification for multiple electronic messages and preserving network bandwidth and other resources. The claims are therefore directed to a particular manner of summarizing and presenting information in electronic devices and thus are not abstract. Twitter again glosses over the specific limitations in this patent that provide concrete technological improvements rooted in mobile communications.

The '059 patent describes a novel communications system to reduce redundant data transfers by mobile devices. In the prior art, to share content, a mobile device would download the content and then upload it to a server for delivery to another device. Under the system described in the '059 patent, the same mobile device can share content via a data hub server that already has the content stored thereon, thereby avoiding the need for the mobile device to first download and then upload the content to be shared with another device. Users of this patent benefitted from more efficient use of bandwidth, battery and other resources in resource-constrained mobile devices. Twitter's claim that the patent is directed to an abstract idea of communicating the availability of content through a networked hub ignores the language of the claims, which provide a technological solution to a specific technological problem—*i.e.,* a specific structure that receives and transmits representational data using directed

1   transmissions to and from mobile wireless devices, thereby minimizing the amount of

2   data sent by mobile devices and reducing unnecessary traffic on the network.

3         Finally, the '777 patent addresses an issue unique to online social networks:  how

4   to constrain the rapid proliferation of potentially harmful or otherwise undesirable

5   content, such as misinformation, defamatory statements and bullying, which can

6   cascade through the network, using up valuable resources.  It is specifically the

7   technological environment in which social networks are implemented and exist that

8   allows for proliferation of such content at a rate that any counterpoint or corrective

9   communications are rendered ineffective—thereby resulting in potentially irrevocable

10  damage to the target of the undesirable content, while using up valuable network

11  resources in the process.  The inventors recognized the need for a technological

12  improvement to prior art systems to curb the proliferation of such content, while

13  preserving free speech and avoiding censorship.  Their solution was a novel

14  technological architecture using a two-tiered approach to identify potentially harmful

15  content and selectively adjust notification of new messages containing similar content.

16  In so doing, the invention interrupts the "circular mill" phenomenon unique to online

17  social networks, where undesirable content rapidly snowballs and inundates network

18  resources and user devices.  The patent overrides the default programmed behavior of

19  the prior art systems, which uniformly allow receipt and notification of all messages

20  regardless of content.  Twitter's argument that the patent is directed to an abstract idea

21  of screening repetitive content when it becomes excessive again ignores both the

22  problem in the prior art that the invention solves and how it does so, including specific

23  claim limitations such as selective overriding of default message sharing settings on the

24  basis of a specific algorithm.  This patent does not protect an abstract idea, but rather a

25  specific and substantial improvement over prior social networks and systems—prior art

26  systems that failed to identify, let alone manage, harmful communications.

27        As explained further below, Twitter fails to carry its heavy burden to prove by

28  clear and convincing evidence that the asserted claims are invalid.

## II.    LEGAL STANDARD

An action cannot be dismissed at the pleading stage if a complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The court must accept all allegations of material fact in the complaint as true, construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences from well-pleaded factual allegations, and resolve all doubts in favor of the pleader. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007)*; Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005).

"A patent is presumed valid, and the burden of establishing invalidity of a claim rests on the party asserting invalidity by clear and convincing evidence." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018) (citing 35 U.S.C. § 282).  The § 101 invalidity inquiry involves a two-step analysis.  A challenger must first demonstrate that the claims as a whole are "directed to a patent-ineligible concept" such as an abstract idea. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  If the challenger carries its burden at step one, it must then also show that the claims lack an "inventive concept"—that is, the claim elements when considered both individually and as a combination involve no more than "well-understood, routine, and conventional activities previously known to the industry." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  That is necessarily a question of fact. *Id.*  "[P]lausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss. *Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 18-1817, 2019 WL 2588278, at *8 (Fed. Cir. June 25, 2019) (court erred by not accepting as true well-pleaded allegations regarding inventiveness).

## III.   ARGUMENT

The asserted patents are directed to technological solutions to specific technical problems recognized by the inventors, and thus are not abstract under applicable precedent.  For example, the Federal Circuit has held as patent eligible claims—like those here—"directed to an improvement in the functioning of a computer." *Enfish,*

1   *LLC v. Microsoft Corp.*, 822 F. 3d 1327, 1338 (Fed. Cir. 2016).  Similarly, it has upheld

2   claims—like those here—that are "necessarily rooted in computer technology in order

3   to overcome a problem specifically arising in the realm of computer networks."  *DDR*

4   *Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014).  Also eligible

5   are claims, as in the '120, '089, and '182 patents, that are "improvements to electronic

6   graphical user interfaces (GUIs), particularly those that simplify the display of data and

7   improve the ease of navigation."  *Core Wireless*, 880 F.3d at 1356.

8          BlackBerry has alleged in detail how each of the inventions was not well-

9   understood, routine, or conventional and provided specific advantages over the prior

10  art.  Dkt. 36 ¶¶ 72-77, 88-93, 105-110, 134-140, 155-161, 180-185, 206-212.  At a

11  minimum, these allegations raise factual issues precluding dismissal.  *Aatrix*, 882 F.3d

12  at 1126-28.  Moreover, to the extent the factual issues raise claim construction disputes,

13  "it will ordinarily be desirable—and often necessary—to resolve claim construction

14  disputes prior to a § 101 analysis."  *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of*

15  *Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).

16         Twitter must establish invalidity of ***each claim*** by ***clear and convincing***

17  ***evidence***.  *Core Wireless*, 880 F.3d at 1364.  Twitter offers no record evidence—

18  let alone the clear and convincing sort—to support its contention that the claims recite

19  patent-ineligible subject matter. *Cellspin*, 2019 WL 2588278, at *8 (vacating dismissal

20  where patentee "made specific, plausible factual allegations that aspects of the claims

21  are inventive"); *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008-09 (Fed. Cir. 2018)

22  (vacating court's holding that patent claims were invalid because determination was

23  "couched in conclusory language" and "pointed to no record evidence that support[ed]

24  its ultimate conclusion").  Twitter also directs its arguments to only a cherry-picked

25  subset of limitations for each claim it chooses to challenge—ignoring other key claim

26  limitations as well as their combination.  *Alice*, 573 U.S. at 217-18; *BASCOM Glob.*

27  *Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-52 (Fed. Cir. 2016).

28  Thus Twitter addresses only what it perceives to be the claimed inventions—not the

*actual* claimed inventions in light of the problem specifically identified in the prior art systems. *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007-08 (Fed. Cir. 2018) (focusing on the "particular way" in which the *actual* "technical solution" solved the prior art's "technological problem"); *Enfish*, 822 F. 3d at 1335-39 (same).

Moreover, while BlackBerry has alleged as "non-limiting example[s]" that Twitter infringes "at least" certain enumerated claims of each asserted patent, by no means are such claims representative of all other asserted claims for any validity determination. Indeed, each claim recites specific limitations that stand on their own. Given each claim is presumed valid and Twitter bears the burden to prove invalidity of *each claim* by clear and convincing evidence, Twitter's approach of designating claims as representative without any analysis is improper. *Cf. BlackBerry*, 2018 WL 4847053, at *11 (dependent claims did not recite patent-ineligible subject matter as they included additional concepts unaddressed by challenger's arguments regarding the representative independent claim); *Dynamic Digital Depth Research PTY Ltd. v. LG Elecs., Inc.*, No. 15-5578, 2016 WL 7444561, at *6 (C.D. Cal. June 6, 2016) (Wu, J.) ("Although Defendants contend in a footnote that there are no meaningful distinctions among the claims, this conclusory assertion is far from clear."). An invalidity analysis under § 101 may be performed based on one or more representative claims, but only after conducting an analysis to establish the claim(s) as representative—not by a party's *ipse dixit* proclamation that a particular claim is representative, as Twitter has done here. Mot. 7 n.1. Although Twitter has failed to provide any such analysis, to the extent this Court considers Twitter's contention, <u>Appendix A</u> sets forth examples of claims and highlights distinct claim elements that Twitter has failed to address.

## A.    The '351 Patent Claims Eligible Subject Matter

### 1.    Step One: The Novel Technical Architecture Is Not Abstract

The '351 patent was conceived and reduced to practice no later than 2001. Back then, an enormous amount of content was available from such sources as servers on the Internet. '351 patent at 1:32-43. In general, though, those information sources were

designed for desktop computers connected through wired connections, not mobile devices connected over wireless networks where battery life, screen size, and bandwidth usage are critical considerations for any system design.  The inventors thus recognized that, were conventional mobile devices to obtain information using methods consistent with "the traditional Internet model" at the time, "the amount of data to be reconciled between the service provider and the mobile device can become very large leading to bandwidth difficulties, particularly when the mobile device is communicating via a wireless packet-switched network or over a traditional paging network . . . ."  U.S. Prov. Pat. App. No. 60/307,265 at 2-3.  The inventors also recognized that directly synchronizing mobile devices with information sources placed an unreasonable burden on mobile devices themselves, which are inherently constrained in terms of battery and processing power.  The '351 patent solved this technological problem by making only relevant portions of the existing information sources available to a mobile device over a wireless network, with the claims directed to a novel and improved technical architecture for aggregating, enhancing, storing, and sending content and advertising information to mobile devices in a targeted and efficient manner over wireless networks.

Twitter's claim that the specification lacks any technical challenge (Mot. 20-21) is belied by the specification's description of technical challenges in prior art "[s]ystems for transmitting information from databases in a computer network . . . over a wireless network to a mobile device . . . [that t]ypically . . . utilize[d] a 'synchronization' or 'pull' method" "executed at the mobile device" "to connect the computer network and initiate the transfer of information over the wireless network" to the mobile device. '351 patent at 1:32-39.  "[S]ome paging networks offer[ed] services to automatically 'push' . . . information," but they too were limited to pushing "small amounts of information" to "alphanumeric paging devices."  *Id.* at 1:39-41.  Prior art systems thus could not transmit large amounts of advertising and content information to mobile devices over a wireless network—a technological problem the inventions solve.

Moreover, the architecture of the inventions is scalable, capable of pre-processing a large amount of information. Indeed, claim 1 teaches a specific manner in which to achieve that scalability: (1) using a specialized proxy content server to preemptively aggregate information collected from diverse sources, classify each piece of information by pre-defined "channel" or "category" to quickly determine which information to send to which mobile device, and store it in a computer memory location associated with that channel or category; (2) transmit specific data in a specific manner using three separate categories of advertising information (that is, with static, dynamic, and default advertising information), *id*. at 7:35-49, which allows for selective transmission of only certain parts, cutting down on data transmission and battery usage; and (3) transmit the specific data to a mobile device based on "feedback signals" that indicate device location, *see, e.g.*, claim 1, thereby minimizing the data sent to the mobile device and targeting specific relevant information for the mobile device user. Because the content is selected and filtered before delivery to the user, neither the small-screen resource-constrained mobile device nor the wireless channel is overwhelmed by a flood of unfiltered data from the Internet.

Twitter argues that "*Core Wireless* is inapposite here," suggesting a subsequent case somehow narrowed it or made it inapplicable to the claims here. Mot. 22 (citing *Trading Techs. Int'l, Inc. v. IBG LLC* ("*Trading Techs II*"), 921 F.3d 1084 (Fed. Cir. 2019)). Not so. The claims in *Trading Techs II* represented an improvement in the regular human activity of trading "goods and shares in companies," not a technological improvement, and the broadly-worded claims "focused on improving the trader, not the functioning of the computer." 921 F.3d at 1091. In contrast, the Federal Circuit upheld the claims in *Trading Techs. Int'l, Inc. v. CQG, INC.* ("*Trading Techs I*"), 675 F. App'x 1001, 1005 (Fed. Cir. 2017), despite that they also related to "displaying market information on a graphical user interface," because they recited "a specific, structured graphical user interface paired with a prescribed functionality directly related to the graphical user interface's structure that is addressed to and resolve[d] a specifically

identified problem in the prior state of the art."  675 F. App'x at 1004.  Indeed, in post-*Core Wireless* precedent, *Data Engine*, 906 F.3d at 1008, the Federal Circuit expressly upheld as non-abstract inventions reciting "a specific solution to then-existing technological problems in computers and prior art electronic spreadsheets."  *See also DDR Holdings*, 773 F.3d at 1257-58 (claims directed to aggregating and serving content from hyperlinked websites).  As in those cases, the inventions here also provide a technological solution to specific problems associated with resource-constrained mobile devices, to connect with various information sources over a bandwidth-constrained wireless network.  The inventions teach a nuanced and specific manner of aggregating, combining, and delivering content and/or advertisements to resource-constrained mobile devices over bandwidth-constrained wireless networks.  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir. 2018) (holding the "flexible and nuanced [software-based] virus filtering" to constitute "non-abstract improvements to computer technology"); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 918 F.3d 1368, 1375 (Fed. Cir. 2019) (claims "directed to using a specific technique . . . to solve a technological problem arising in computer networks" were not abstract).

Twitter argues that the patent claims could be performed "mentally or with pen and paper," Mot. 21, but fails to acknowledge that the claims are directed to solving a technological challenge associated with transmitting information over a wireless network to a mobile device.  Twitter's analogy of "compos[ing]" a newspaper weekend edition "by assembling a layout for the newspaper with articles selected from various categories" does not solve such a technological challenge.  Claim 1 also recites technical steps such as aggregating information into computer "memory locations," "receiv[ing] a feedback signal . . . indicat[ing] a position of the mobile device," and then "us[ing] the feedback signal" to filter information for delivery to the mobile device—all combined to form "[a] system for pushing information to a mobile device."  Twitter's non-technological alleged analog cannot perform these steps, let alone combine them into a solution to address deficiencies of the prior art systems.

Twitter also asserts that claim 1 is directed broadly to the concept of targeted advertising.  Mot. 21.[2]  Not so, as explained above.  Twitter's approach presents a "descri[ption of] the claims at [] a high level of abstraction and untethered from the language of the claims."  *Enfish*, 822 F.3d at 1337.  The Federal Circuit admonishes against this type of oversimplification.  *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1307-08, 1313 (Fed. Cir. 2016) (holding as patent eligible claims that, at a high level of abstraction, could be understood as directed to "collection, analysis, and display" of information).  The patent provides a new solution for ***how*** content and advertising information are efficiently maintained (at a proxy content server), packaged (using default, static, and dynamic information), and transmitted to a mobile device— including based on a feedback signal indicating location.  This distinction highlights why "the claims here are directed to an improvement in the functioning of a computer" and thus are patent eligible.  *Enfish*, 822 F. 3d at 1338.  The invention also minimizes the amount of data sent to a mobile device over wireless networks, a problem "particular to the Internet."  *DDR Holdings*, 773 F.3d at 1247.  The claims are therefore not abstract and so the inquiry ends at step one.  *Enfish*, 822 F.3d at 1339.

## 2. Step Two: The Inventive Concept Precludes Dismissal

Twitter's motion should be denied at step one.  Should the Court reach step two, factual disputes preclude dismissal, as this Court previously found.  *BlackBerry*, 2018 WL 4847053, at *7.  Twitter's claim that organizing advertising information into memory location channels based on pre-defined categories is conventional, Mot. 23, is unsupported.  There is no evidence this element, individually or as a combination with other elements, was "well-understood, routine, and conventional activities previously

---

[2]  Twitter's reliance on *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015) is misplaced.  Those claims involved notifications of when spending exceeded a pre-set limit.  Such claims covered "methods of organizing human activity" entirely unlike the claims of the '351 patent.  So too in *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014), where claims recited using generic computer technology to implement the basic idea of knowing one's audience.

known to the industry." *Aatrix*, 882 F.3d at 1128.  Moreover, Twitter's reliance on *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) is inapposite, as the claims there covered virtually all forms of collection, analysis, and display of data. Here, by contrast, the claims recite a specific manner of aggregating and processing information to efficiently and quickly make it available to mobile devices over wireless networks.   Twitter's assertion that the claims do no more than sort and store information is an abstraction untethered to claim language.  *Enfish*, 822 F.3d at 1337.

Twitter also contends there is nothing inventive about transmitting specific data from a memory location channel based on a feedback signal or triggering event.  Mot. 23.  This oversimplification ignores that classifying advertising and content into pre-defined categories and storing them into memory locations enables the proxy content server to enhance the information with static, dynamic, and default advertising information, and then select only that information which is relevant to the mobile device—before sending it thereto.  So the capabilities of the proxy content server and its network architecture enable only a selective subset of information to be sent to a mobile device over a wireless network, with distinct benefits for mobile device users. Dkt. 36 ¶ 85.  Moreover, the elements were not conventional, well-understood or routine, and operated together to provide an improved system for delivery of relevant and timely advertising information to mobile device users, "a specific and substantial improvement" over prior art systems.  *Id*. ¶¶ 88-90.  BlackBerry's allegations are sufficient at this stage at least to raise a factual dispute at step two.  *Cellspin*, 2019 WL 2588278, at *8 ("plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss); *BASCOM*, 827 F.3d at 1349-52 (combination of limitations formed the requisite inventive concept); *BlackBerry*, 2018 WL 4847053, at *7 (same).

Finally, Twitter asserts claim 1 is "exemplary" of the asserted claims, but provides no analysis to demonstrate such claim is representative of all other claims.

1  Mot. 19.  It is not.[3]  For example, other claims include limitations such as "an
2  advertising and information software module" and "a channel content database," or "an
3  operating system."  *See* Appx. A.

4  **B.   The '929 Patent Claims Eligible Subject Matter**

5  **1.   Step One: The Novel Technical Architecture Is Not Abstract**

6  The '929 patent uses the same fundamental architecture as the '351 patent, and
7  also teaches the use of a "meta tag" that "relates to display of specific one or more
8  advertisements with the content information." '929 patent at Abstract.  Like the '351
9  patent, it is a solution directed to solving a problem specifically arising in sending
10 information to wireless devices.  Specifically, once the proxy server detects a "time
11 triggering event," it determines content relevant to the time trigger.  *Id.* at 11:45-66.
12 The server may then embed a "meta tag" into the content and send the content
13 including the meta tag to the mobile device.  *Id.* at 11:66-12:16.  This preserves
14 bandwidth and device resources by sending a meta tag in lieu of a full advertisement
15 (which is a larger piece of data), thereby allowing the mobile device to receive the full
16 advertisement corresponding to the meta tag only when it actually accesses the content.

17 As an example: "Meta tags are embedded control sequences that the Proxy
18 Content Server has inserted to indicate when advertising should be inserted."  *Id.* at
19 8:32-35.  This meta tag is served along with content and consumes less data than the
20 full advertisement because, for example, it teaches using "a cross reference value to
21 reach the full advertising on the mobile device."  *Id.* at 12:11-15.  That is, rather than
22 sending the full advertisement, the patent describes sending an embedded control
23 sequence referencing the full advertisement to be timely delivered to the device later—

25 [3]  Twitter's reliance on BlackBerry's complaint is misplaced.  BlackBerry used the
26 term "exemplary" to indicate claim 1 was one "non-limiting example" of Twitter's
infringement, not that it was representative of all other claims. Dkt. 36 ¶ 96 ("As just
27 one non-limiting example, set forth below . . . is a description of infringement of
28 exemplary claim 1 of the '351 Patent . . . .").

for example, when the device is actually accessing or displaying the content to which the advertisement corresponds, thereby ensuring that bandwidth is not consumed sending advertisements that a user may never see. Against the backdrop described above in § III.A.1, the claims teach a novel technological architecture to transmit data to mobile devices over a wireless network—including a meta tag in lieu of the advertisement to further save bandwidth over the wireless network and computational resources (and therefore battery usage) on the wireless device.

### 2. Step Two: The Inventive Concept Precludes Dismissal

Notwithstanding the foregoing, factual disputes preclude dismissal at step two, as this Court has previously found. *BlackBerry*, 2018 WL 4847053, at *7; *id.*, No. 18-1844, Dkt. 156 at 12 (C.D. Cal. Apr. 5, 2019). Twitter's assertion that a "meta tag" is merely a "reference value" that refers to the advertisement and indicates when advertising should be inserted, which purportedly solves no technical challenges and provides no improvements, Mot. 23-24, is unsupported. Twitter fails to acknowledge that transmitting and processing a meta tag in lieu of the full advertisement saves bandwidth over the wireless network and computational resources (and so battery usage) on the wireless device, and that the timing element of inserting advertisements was an important benefit. Moreover, in 2001, the combination of recited limitations constituted an inventive concept used to deliver advertising content, "a specific and substantial improvement over prior communication systems." Dkt. 36 ¶¶ 72-74. Twitter's arguments at most raise factual disputes as to whether serving advertising via meta tags along with non-advertising content in response to a time triggering event is an "inventive concept." *Cellspin*, 2019 WL 2588278, at *8; *BASCOM*, 827 F.3d at 1349-52; *BlackBerry*, 2018 WL 4847053, at *7.

Twitter also asserts claim 9 is "exemplary" of the asserted claims, but provides no analysis to demonstrate such claim is representative of all other claims. Mot. 19. It is not. For example, other claims include limitations such as "requirements established to a user of the mobile device, an advertiser, or an interested third party," "a cross

-14-

1   reference value . . .,” and “wherein the server determines, inserts, and transmits for each

2   of the remaining plurality of memory location channels.”[4]  *See* <u>Appx. A</u>.

3   **C.   The '120 Patent Claims Eligible Subject Matter**

4   **1.   Step One: The Novel Graphical User Interface Is Not Abstract**

5   This Court previously found the claims of the '120 patent “drawn to a

6   technological improvement over other communication device messaging systems rather

7   than . . . an abstract idea.”  *BlackBerry*, 2018 WL 4847053, at \*14.  That conclusion

8   controls here.  Twitter’s argument that claim 13 is directed to “the abstract idea of

9   sorting, analyzing, and presenting new messages,” Mot. 27, is misplaced.  Twitter

10  ignores both the problem that the invention solves and how it does so.  The patent

11  explains—against the technological context in or before 2009—that “[e]lectronic

12  messages, such as electronic mail messages and messages posted to group sites, can be

13  grouped into message threads,” which are groups of messages related to the same

14  matter.  '120 patent at 1:22-24.  It further explains that “[a] user may receive a

15  notification each time an electronic message is received.”  *Id.* at 1:28-30.  Such

16  “[n]otifications could include, for example, auditory user alerts such as ring tones,

17  visual alerts such as flashing lights or pop-ups and physical alerts such as vibrations.”

18  *Id.* at 1:30-32.  Because such devices are multi-functional and also include “various

19  applications enabling users to, for example, listen to music, watch video files, play

20  games, view picture files, surf the internet wirelessly, etc.,” *id.* at 7:60-67, the incessant

21  notifications in prior art were disruptive to the user.  The inventors recognized the need

22  for an improved user interface for providing users the ability to selectively silence such

23  notifications on a per-thread basis thereby suppressing notifications for only some

24  communications.

25  Claim 1, among others, recites an improved user interface and communication

26

27  ⁴   As with the '351 patent, Twitter’s reliance on BlackBerry’s complaint is

28  misplaced, for the same reasons.  *See* n.3, *supra*; Dkt. 36 ¶ 80.

-15-     CASE NO. 2:19-CV-01444-GW-KS

system.  It teaches that once the system receives a user command selecting an electronic message thread for silencing, the system activates a flag—indicating the selected thread has been silenced.  *Id.* at claim 1.  The system then ascertains which new incoming message is associated with the selected message thread, checks whether the flag associated with the selected message thread remains activated, and if so, overrides the default notification setting (preventing a notification for that thread), and displays the processed new message in the inbox in a different manner than the non-silenced message threads.  *Id.*  The specification explains that when a user who has silenced a message thread reactivates that thread, that user may again receive notifications, and messages associated with such a reactivated message thread may no longer appear to be greyed out or otherwise modified in appearance when displayed with the inbox content. *Id.* at 13:42-45.  Claim 7 captures that teaching, reciting that the system of claim 1 can be "further adapt[ed] . . . to allow the message thread to be unflagged deactivating the flag."  Claim 3 goes further, specifying the granularity at which the communication system of claim 1 allows selective silencing of message threads.  That specificity makes clear the claims are drawn to a technological improvement over other messaging systems, creating an improved electronic user interface.  *BlackBerry*, 2018 WL 4847053, at *14; *Core Wireless*, 880 F.3d at 1362; *Trading Techs I*, 675 F. App'x at 1004-06 (claims "solve[d] problems of prior graphical user interface devices" by "impart[ing] a specific functionality to a trading system," reciting a specific manner of processing and displaying information).  Twitter ignores that specificity in the claims.

Twitter's reliance on *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) is also misplaced.  The claims there recited a broad process that merely used the computer as a tool to receive, screen, and distribute e-mail, like a "brick-and-mortar" post office.  *Id*.  Such broad claims that recite "human-practicable concepts" carry significant preemption concerns.  Similar concerns dictated the result in *Electric Power*, 830 F.3d at 1354, where the "process of gathering and analyzing information . . . then displaying the results," without "any particular assertedly

inventive technology for performing those functions" was ineligible.

The claims here do not abstractly apply rules in a computer environment, but are specific to selecting specific communication threads, processing them in a particular manner, directing them to an inbox, overriding the "routine and conventional" behavior of providing a notification about them, and displaying them in a visually distinct manner on the device. By selectively overriding notification settings and viewing silenced messages in a visually distinct manner on the device, the claims are directed to "a particular manner of summarizing and presenting information in electronic devices" and not abstract. *Core Wireless*, 880 F.3d at 1362-63; *Data Engine*, 906 F.3d at 1007.

## 2.    Step Two: The Inventive Concept Precludes Dismissal

The Court previously found "the combination of claimed elements" of the '120 patent sufficient to allege an inventive step. *BlackBerry*, 2018 WL 4847053, at *14 n.16. Twitter offers nothing to change that conclusion. It argues the claims of the patent simply recite conventional and routine elements (Mot. 28-29), but evaluates three limitations *in isolation*—"activat[ing] a flag," "overrid[ing] a currently-enabled notification," and "display[ing] the [silenced] message . . . in a different manner."[5] Twitter's analysis fails for that reason alone, as these limitations must also be evaluated as a combination to discern the inventive concept. *See, e.g.*, *BASCOM*, 827 F.3d at 1350. By submitting no evidence directed to these elements as a combination, Twitter fails to carry its burden at step two. This is particularly true where, as here, BlackBerry has alleged that these limitations were inventive and operated together to selectively override notification settings and display silenced messages in a visually distinct manner on the device, "a specific and substantial improvement over prior messaging notification systems." Dkt. 36 ¶¶ 105-107. *Cellspin*, 2019 WL 2588278, at *8; *Aatrix*,

---

[5]   Even when considered "individually," Twitter ignores key parts of the elements: focusing only on "flags," not on "activat[ing] a flag"; on "overriding notifications," not on "overrid[ing] a currently-enabled notification"; and on "displaying messages," not on "display[ing] the [silenced] message . . . in a different manner." Mot. 28-29.

1    882 F.3d at 1126-28; *BlackBerry*, 2018 WL 4847053, at \*14 n.16, \*14-15.

2          Twitter also asserts claim 13 "is representative," but provides no analysis.  Mot.

3    24.  It is not.  For example, other claims include limitations such as "a group

4    discussion," "a receipt notification for a new incoming electronic message," "allow[ing]

5    the message thread to be unflagged [and] deactivating the flag," "notifications [that]

6    include one or more of an auditory alert, a visual alert or a physical alert," and "the new

7    incoming message is displayed in a default view of the inbox."  *See* Appx. A.

8    **D.    The '089 Patent Claims Eligible Subject Matter**

9          **1.    Step One: The Novel Graphical User Interface Is Not Abstract**

10         Twitter argues claim 1 of the '089 patent is directed to nothing more than "the

11   abstract idea of flagging new messages until an inbox has been checked," and "does not

12   arise from a technological problem or offer a technological improvement."  Mot. 5.

13   Again, Twitter ignores the problem that the invention solves and how it does so.  The

14   patent explains that exchanging messages on wireless and mobile devices (in or before

15   2005) had become "an increasingly important feature" and such "messages received by

16   the device [were] typically viewed using a graphical user interface (GUI)."  '089 patent

17   at 1:34-39.  In prior art GUIs, the user was notified of all new unopened messages using

18   a counter.  *Id.* at 1:39-51.  The inventors made a rather counterintuitive observation:

19   "[m]any device users receive far too many email messages for a simple unopened

20   counter to be of much use.  The number of unopened emails becomes so large that the

21   count itself is largely irrelevant.  These users need some way to be informed that they

22   have new messages as distinct from unopened messages on the device."  *Id.* at 1:52-57.

23   So the inventors came up with an improved user interface for such devices.

24         Claim 1, among other claims, embodies that improvement.  The claim requires

25   "setting a new message flag to indicate receipt" and correspondingly "representing, on

26   a home screen . . . on the display, a new message indicator" upon receiving a new

27   message.  But upon "receiving an invocation to switch" from the home screen to "a

28   message inventory display screen" (*i.e.*, that previews messages), including the newly

received message—"unsetting the new message flag" with "the new message indicator cleared off the home screen," having fulfilled its purpose.  An analog mailbox can neither replace "a prior art message notification system for electronic communication devices using a counter" nor provision for the technological limitations that collectively recite an improvement over that prior art.

Twitter argues "the Federal Circuit [recently] made clear that claims directed to displaying information . . . are patent-ineligible when they merely improve how a user processes information."  Mot. 1 (citing *Trading Techs II*, 921 F.3d at 1093).  But as explained in § III.A.1, the claims in *Trading Techs II* "focused on improving the trader, not the functioning of the computer."  921 F.3d at 1091.  Indeed, in another post-*Core Wireless* precedent, the Federal Circuit upheld inventions reciting "a specific solution to then-existing technological problems," *Data Engine*, 906 F.3d at 1008.  Analogous to *Core Wireless* and *Data Engine*, where the claims raised no preemption concerns given their specificity, the claims here improve a conventionally programmed behavior in prior art GUIs using "a particular manner of summarizing and presenting information in electronic devices."  *Core Wireless*, 880 F.3d at 1362-63.

## 2.    Step Two: The Inventive Concept Precludes Dismissal

Twitter offers no support for its assertion that the claims recite conventional and routine elements.  Mot. 6-7.  It resorts to discussing certain claim elements individually and asserts each, on its own, recites "routine acts of" a "communication device having a display."  Mot. 6.  But BlackBerry specifically alleged the limitations operate together to provide a less-frequently updating—and so less intrusive—user interface, "a specific and substantial improvement over prior messaging notification systems."  Dkt. 36 ¶¶ 155-158; '089 patent at claims 1, 6, 7.  Twitter fails to evaluate the limitations as a combination or demonstrate the limitations were not inventive in 2005.  *Cellspin*, 2019 WL 2588278, at *8; *BASCOM*, 827 F.3d at 1349-52; *Aatrix*, 882 F.3d at 1126-28.

Twitter's reliance on *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016) is misplaced.  The claims there were so broad they carried significant

preemption concerns.  The claims detected improper access to a person's health records by generating and applying a rule to "audit log data."  *Id.* at 1092.  The claims here do not abstractly apply generic rules in a computer environment, but instead cover a specific improvement to the user interface of communication devices and their use of new message counters to notify users of new messages.  Twitter again describes the claims abstractly, untethered to the actual claim language.  *Enfish*, 822 F.3d at 1337.

Moreover, Twitter fails to address elements of any claims other than claim 1, which provide additional limitations such as "activating a light emitting diode (LED) on the device when the new message flag is set," "changing the state of an electronic message assigned the new message state to an old message state when the electronic message is opened on the device," "updating the new messages counter when the state of any electronic message has changed from new to old, or old to new, or when the electronic message received by the device is assigned a new and opened, or new and unopened state."  *See* Appx. A.

### E.     The '182 Patent Claims Eligible Subject Matter

#### 1.     Step One: The Novel Technical Architecture Is Not Abstract

Twitter argues that claim 1 of the '182 patent is directed to "the abstract idea of inferring the status of messages in a conversation, such as whether the messages have been delivered or read," relying on a human conversation as an analogy.  Mot. 8-9.  But the issue addressed by the '182 patent is quite different than Twitter's analogy and set against the technological context and state of instant messaging (IM) communications systems in or before 2006.  A sender on a first device does not have the benefit of hearing from the receiver on a second device in an IM conversation, as the messages are sent and read remotely on a device, not exchanged in a face-to-face conversation.  After all, in an IM conversation carried out through a technological medium, "it may take some time for the user to notice the received message, to read it and to type and send the response."  '182 patent at 1:18-20.    And a user receiving an IM may take some time to notice the received message and respond.  *Id*. at 1:17-18.  In such a

situation, the sender of the message may wait a long time for a response before realizing that the user has not participated in the conversation. *Id.* at 1:19-21.  Prior art IM systems handled this issue by providing senders "Message_Delivered," "Message_Read," "Typing_Started," and "Typing_Stopped" notifications for ***each message*** exchanged between the devices. *Id.* at 1:22-32.  But the redundant notifications required bandwidth that could have been used for other communications. *Id.* at 1:33-34.  They also would consume computational resources on users' devices, which would process each of the notifications and render them on the screen.  The inventors recognized the need for an architecture to reduce such redundant notifications in the specific technological context of IM communications systems.

Claim 1, among others, embodies that architecture to reduce redundant notifications.  It teaches a method for managing notifications between two devices so that communications between them are reduced.  *Id.* at claim 1.  The mechanism comprises sending a plurality of IMs from the first to the second device, and receiving a status notification for only one of the plurality of messages—but not the messages sent before the one for which the status notification was received.  *Id.*  A processor updates an internal record to reflect the status of the message for which the status notification was received and to further reflect an inferred status for the message(s) sent before the one for which the status notification was received.  Therefore, the improved IM system can utilize a single status notification for multiple IMs.

Twitter glosses over these limitations as it argues that the claims use "result-based functional language."  Mot. 9.  In the case Twitter cites in support, the court invalidated claims that did "not sufficiently describe how to achieve the[] results in a non-abstract way." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).  Here, though, the claims are quite specific: rather than broadly using only generic functional language (*e.g.*, solely claiming the step of "generating a screen display"), the claims specify the architecture behind the computer improvement by reciting how the IM system groups conversations into distinct

BLACKBERRY'S OPPOSITION TO TWITTER'S MOTION TO DISMISS

categories—a set of messages without any status notification and a particular message with a status notification—and then a processor selectively "updat[es] an internal record" to reflect the received status notification for the latter and inferred status notification for the former.  The specification likewise discloses particularized embodiments. '182 patent at 2:41-49 (describing algorithm and data structures used to implement a particular embodiment); *id*. at Figs. 2-8 (detailing algorithms on how to reduce notifications).  Moreover, the specific implementations recited in the claims detail how to "produc[e] a certain result, or effect" using a set of specific, non-abstract claimed steps, not all abstract manners in which the results could be achieved. *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010).

Twitter also suggests that the claims contain insufficient "hardware" recitations (Mot. 9), but it is well-established that "[s]oftware can make non-abstract improvements to computer technology." *Enfish*, 822 F.3d at 1335.  The claims override the default behavior of the prior art system, reducing the data exchanged between the sender and receiver devices and thus creating not only an optimized communication system that utilizes less bandwidth for status notifications, but also a better experience for mobile device users utilizing IM communications systems, on its face a problem "particular to the Internet." *DDR Holdings*, 773 F.3d at 1247.  Alternatively stated, the claims here are directed to an improved architecture to provide to the user  status notifications as to an entire electronic conversation without waiting for the notifications to be received, processed, and displayed for each distinct message in that conversation.

By operating on a reduced number of status notifications in an electronic conversation while informing the user as to the status of the entire conversation, the claims are directed to "a particular manner of summarizing and presenting information in electronic devices," and thus are not abstract.  *Core Wireless*, 880 F.3d at 1362-63.

### 2.    Step Two: The Inventive Concept Precludes Dismissal

Twitter also fails to meet its burden at step two.  As discussed at step one, the inventions make specific improvements to prior art IM systems.  *See, e.g.*, '182 patent

-22-

at claims 1, 4. Twitter offers nothing to demonstrate the claimed elements individually or as a combination were "well-understood, routine, and conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128. BlackBerry has specifically identified limitations in its status notification mechanism which operate together to reduce redundant notifications and conserve precious computation resources, "a specific and substantial improvement over prior messaging notification systems." Dkt. 36 ¶¶ 180-182. These allegations preclude dismissal at step two. *Cellspin*, 2019 WL 2588278, at *8; *Aatrix*, 882 F.3d at 1126-28.

**F.    The '059 Patent Claims Eligible Subject Matter**

**1.    Step One: The Novel Technical Architecture Is Not Abstract**

Twitter argues claim 1 of the '059 patent is directed to "the abstract idea of communicating the availability of content through a networked hub," not to "a technological solution specific to a technological problem." Mot. 11-12. However, the patent explains—against the technological context in or before 2009—that content exchange between mobile wireless devices involved one device downloading content before sending it to another wireless device, which required uploading the content, and a server routing the uploaded content to the second mobile wireless device—***every time*** the content was to be exchanged or shared. The inventors recognized that sharing content required an improved architecture, particularly on mobile wireless devices with bandwidth, battery, and performance constraints. *See, e.g.*, '059 patent at 18:5-12.

Claim 1, among others, embodies that improved communication system to reduce redundant transfers of data by mobile wireless devices over wireless networks, in which mobile wireless devices share informational content using a data hub server. First, the data hub server receives, in a directed transmission, a representation of the informational content from a first server, where the first mobile wireless device is a client of the first server. *Id.* at claim 1. Second, the data hub server notifies the availability of the informational content to the second mobile wireless device using a directed transmission to a second server, where the second mobile wireless device is a

client of the second server.  *Id.*  Claims 2 and 3 further include transmitting the informational content from the first mobile wireless device to the first server.  *Id.* at claims 2 and 3.  Doing so "reduce[s] the processing on the mobile electronic client devices" and "extend[s] the battery life of the mobile electronic client devices."  *Id.* at 18:5-12.  Twitter argues that the claims are analogous to delivering "a large package" using postal carriers.  Mot. 12.  But the patent does not teach that the first device transmits the informational content—"a large package"—to the first server and then to the data hub server each time that content is to be shared with a second device.  To the contrary, the patent does not require the first device to transmit the informational content to the data hub server at all.  Rather, the patent only requires the first device to transmit "*a representation* of the informational content."  That minimizes the amount of data sent by mobile devices and permits users to more effectively share information from the Internet, on its face a problem "particular to the Internet."  *DDR Holdings*, 773 F.3d at 1247.  Twitter ignores these limitations.

Moreover, Twitter's reliance on *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019) is misplaced.  There, "[t]he problem identified by the patentee" "was the lack of a communication network that would allow drivers, businesses, and utility companies to interact efficiently with the charging stations," and so "the invention of the patent [was] nothing more than the abstract idea of communication over a network for interacting with a device, applied to the context of electric vehicle charging stations."  *Id.* at 767-68.  The claims were broadly worded and would have preempted any networked charging stations.  *Id.*  By contrast, the specific problem addressed in the '059 patent is retransmission and sharing of content between mobile devices, an activity that taxes device bandwidth, battery life, and performance— as well as the overall system bandwidth.  '059 patent at 18:5-12.  The claims thus recite a specific technological architecture including a first server, a data hub server, and a second server deployed as the network backbone, and transmitting representational information across the backbone using directed transmissions.  This particularized

configuration of hardware and software raises no preemption concern, as it is focused on the concrete problem of reducing data transmissions associated with file sharing and improving bandwidth usage. Thus, "the claims here are directed to an improvement in the functioning of a computer" and are patent eligible. *Enfish*, 822 F.3d at 1338.

### 2.   Step Two: The Inventive Concept Precludes Dismissal

Twitter also fails to meet its burden at step two. The patent does not simply recite "using generic computer networking components" that perform "generic computer networking functionalities." Mot. 13. Instead, the patent provides an unconventional improvement to standard communications systems used to share content—by ensuring informational content need not be transmitted from the first mobile device at all or at most only once. Moreover, a representation of informational content is transmitted between the first server, of which the first mobile device is a client, and the data hub server. *See, e.g.*, '182 patent at claims 1, 11, 16.

Moreover, unlike the patent ineligible claims in *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (selection, analysis, and reporting of information not tethered to any embodiment broadly preempted all uses of data), the claims here recite a specific structure receiving and transmitting representational data using directed transmissions and, as such, are "tied to a specific structure of various components" and "narrowly drawn to not preempt any and all generic [treatment] of data in a similar system." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016). The claims also "purposefully arrange[] the components . . . to achieve a technological solution to a technological problem." *Id*.

Nor does Twitter demonstrate the claim elements, as a combination, were present in "well-understood, routine, and conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128. BlackBerry's complaint alleges that the network comprising a first server, a data hub server, and a second server and the representational information transmitted across the network using directed transmissions operate together to minimize data transmissions over the network and provide "a specific and

substantial improvement over prior electronic messaging systems in electronic devices." Dkt. 36 ¶¶ 134-137. These factual allegations preclude dismissal at step two. *Cellspin*, 2019 WL 2588278, at *8; *Aatrix*, 882 F.3d at 1126-28; *Amdocs*, 841 F.3d at 1303 (the "combination of the[] limitations yield[ed] an inventive concept").

Twitter also incorrectly asserts claim 1 "is representative," but provides no analysis. Mot. 10. For example, other claims recite "autonomously transferring the informational content" or "browsing the first server from the first mobile electronic device and selecting the informational content in the first server." *See* Appx. A.

## G.    The '777 Patent Claims Eligible Subject Matter

### 1.    Step One: The Novel Technical Architecture Is Not Abstract

Twitter's argument that claim 1 of the '777 patent is directed to "the abstract idea of screening repetitive content when it becomes excessive," Mot. 15, is misplaced. Twitter again ignores both the problem that the invention solves and how it does so. The patent explains—against the technological context in or before 2011—that "[t]he relative ease and speed with which content can be generated and communicated within social networks" has downsides, including, for example, that "[h]ackers, or even normal users, can de-frame [*sic*] or bully other users in a social network environment very easily and quickly with messages whose content may include misinformation or untruthful, derogatory or defamatory statements that may even have elements of libel or slander." *Id*. at 1:27-34. It is specifically the technological environment in which social networks are implemented and exist that allows for this proliferation of content such that "the rate of transmission and re-transmission of detrimental messages can grow at such a fast rate as to render counter-point or corrective communications ineffective, resulting in potentially irrevocable damage to the target of the misinformation." *Id*. at 1:35-42. Indeed, such issues do not exist "in a normal free-speech arena" in a non-technological context. *Id*. The patent relatedly explains that "the unrestrained dissemination of messages in a social network can have adverse effects on network traffic. . . . With the ability of social network users to easily and in

real-time copy and re-transmit popular messages from one user to a multitude of other users, as is the case of re-tweeting on Twitter, for example, the potential reach of such re-postings within the social group can be *exponential*, presenting *a significant hazard to bandwidth and other traffic resources of the network*." *Id*. at 1:42-58 (emphases added).[6]  The inventors thus recognized the need for a technological improvement to prior art systems to discern messages that may cause detrimental effects on network traffic, bandwidth, and users and to curb undesirable proliferation thereof.

Claim 1, among others, recites such an improved technological architecture, neutralizing the effect of unrestrained re-transmissions of potentially harmful messages and content.  It teaches a system that receives "electronic communications within a social group of a social network" and monitors messages within the group.  *Id*.  The system "determines" (*e.g.*, flags) content if the number of messages containing that content "exceeds a growth rate threshold" or the number of such messages "exceeds a message quantity threshold."  *Id.*  Whenever such content is flagged, the system subsequently checks whether new messages to the social group contain content similar to the flagged content.  The system then selectively adjusts notification of any such new messages to the one or more members of the social group.  *Id.*

Thus, claim 1 is directed to using a tiered approach to identify deleterious content and flag it for selective notification—enabling a social network communications system "to do things it could not do before." *Finjan*, 879 F.3d at 1305.  In so doing, the invention refines the quality of messages sent over a social network by specifically handling notifications of messages that may harm the network or its users, while preserving network resources and bandwidth by curbing the continued proliferation of such content and creating a better experience for users consuming information from

---

[6]  The exponential reach of re-postings is a technological problem that could not and "did not arise in the" non-digital world, *IBG LLC v. Trading Techs. Int'l, Inc*., 757 F. App'x 1004, 1007 (Fed. Cir. 2019), contrary to the examples cited by Twitter.  Mot. 16 (messages sent to a city council member's office, solicitations for alumni donations).

around the Internet, a problem "particular to the Internet." *DDR Holdings*, 773 F.3d at 1247.  In challenging the patent eligibility of claim 1's invention, Twitter ignores express claim language and instead describes the claimed inventions "at such a high level of abstraction and untethered from the language of the claims" to "all but ensure[] that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337.

Twitter analogizes claim 1 to those in *Symantec*, 838 F.3d at 1317.  Mot. 15-16. As detailed earlier in § III.C.1, the *Symantec* claims encompassed "human-practicable concepts" and raised significant preemption concerns.  Not so here.  Claim 1, for instance, monitors certain "electronic communications" on a social network and determines content being shared at a certain growth rate and that "present[] a significant hazard to bandwidth and other traffic resources of the network."  The patent requires processing these messages in a distinct fashion, overriding the "routine and conventional" behavior of notifying users, which could result in further proliferation of new messages containing similar content and harm the network and its users.

That specificity is also lacking in the claims in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018), another case Twitter cites in support.  Mot. 16-17. There, the court invalidated claims that contained generic functional language and did "not sufficiently describe how to achieve the[] results in a non-abstract way." *Interval Licensing*, 896 F.3d at 1344.  Here, the claims are quite specific: claim 1 describes the specific technical architecture behind the improvement by setting forth the criteria under which electronic messages on a social network may be monitored and their content determined to satisfy growth or volume thresholds (*e.g.*, and be detrimental to users or cause network congestion as such)—and then recites steps to selectively adjust notifications of such messages to avoid their potential harmful effects.  '777 patent at claim 1; *see id.* at 2:21-33.  The specification explains that "[w]ith the ability of social network users to easily and in real-time copy and re-transmit popular messages from one user to a multitude of other users, as is the case of re-tweeting on Twitter, for example, the potential reach of such re-postings within the social group or network can

be exponential, presenting a significant hazard to bandwidth and other traffic resources of the network." *Id.* at 1:52-58. That problem "did not arise in the" non-digital world, *IBG*, 757 F. App'x at 1007, and the claim language is specifically directed to solving that problem—and thus to alleviating the effect of quick and exponential dissemination of messages on a social network. Indeed, the claims recite how specifically to "produc[e] a certain result, or effect" using a set of non-abstract, computational steps, *McRo*, 837 F.3d at 1314, not abstract ways in which harmful messages could be identified and handled. *Research Corp.*, 627 F.3d at 869.

Twitter argues the claims do not sufficiently specify "how to determine when a message or content has met the claimed criteria" or "how to selectively adjust notifications for a new message." Mot. 16. But the claims recite the exact criteria that must be used to flag potentially harmful content and then recite limitations to adjust notifications of new messages containing similar such content. *See* '777 patent at claim 1. That much is sufficient at the pleading stage. *BlackBerry*, 2018 WL 4847053, at *15 ("how much 'how' is necessary may ultimately be dependent on the level and knowledge of a person of skill in the art at the time of the invention").

The claims here override the default programmed behavior of prior art systems, which uniformly allowed receipt and notification of all messages—including those potentially deleterious to network traffic or network users. Reducing visibility of the messages exchanged over the network to temper further proliferation of similar messages and in turn creating a better experience for social network users trying to effectively consume information on the Internet is on its face a problem "particular to the Internet." *DDR Holdings*, 773 F.3d at 1247. Moreover, by selectively overriding default message notification settings based on a specific algorithm, the claims are directed to "a particular manner" of handling "information in electronic devices" and not abstract. *Core Wireless*, 880 F.3d at 1362-63; *Data Engine*, 906 F.3d at 1007.

## 2. Step Two: The Inventive Concept Precludes Dismissal

Twitter also fails to meet its burden at step two, where its common refrain is

-29-

mere attorney argument that the claims do not involve any "technical challenge" or "improvement."  Mot. 17-18.  But as discussed at step one, the claims make specific technological improvements over prior art systems, particularly as to determining content of interest and selectively adjusting notification thereof—a departure from the prior art's routine and conventional behavior of providing notifications for each electronic communication.    The Federal Circuit has "repeatedly held" such improvements patent eligible.  *Aatrix*, 882 F.3d at 1127; *BASCOM*, 827 F.3d at 1350.

Twitter also frames its arguments with respect to individual claim limitations (Mot. 17-18), but fails to show how their combination was "well-understood, routine, and conventional activities previously known to the industry."  *Aatrix*, 882 F.3d at 1128.  In contrast to Twitter's mere *ipse dixit* allegations, BlackBerry has pled factual allegations—which must be taken as true at this stage—that its improved mechanism includes novel limitations that operated together to identify "electronic communications" that may be detrimental to users and weigh on network traffic and bandwidth, and adjust notifications to alleviate such harms, "a specific and substantial improvement over prior social networks and systems" that failed to identify, let alone handle, such electronic communications. Dkt. 36 ¶¶ 206-212.  These limitations, which the inventors expressly identify as differentiated over the prior art, combined to solve a specific problem in the prior art.  BlackBerry's factual allegations preclude dismissal at step two.  *Cellspin*, 2019 WL 2588278, at *8; *Aatrix*, 882 F.3d at 1126-28.

Finally, Twitter fails to address elements of any claims other than 1, 10, and 19, which provide additional limitations such as "selectively prioritizing communication" or "selectively delaying a reception" of new messages.  *See* Appx. A.

## IV.   CONCLUSION

For the foregoing reasons, Twitter's motion should be denied.  If the Court were inclined to grant any part of the motion, BlackBerry requests leave to amend its complaint.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *Aatrix*, 882 F.3d at 1128.

1  Dated: July 24, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

By */s/ James R. Asperger*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
Yury Kapgan (Bar No. 218366)
yurykapgan@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Jordan R. Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

BLACKBERRY CORPORATION
Edward R. McGah, Jr (Bar No. 97719)
emcgah@blackberry.com
Vice President, Deputy General Counsel—
Litigation
41 Ticknor Place
Laguna Niguel, CA 92677
Telephone: (650) 581-4750

Counsel for Plaintiff BlackBerry Limited